JUDGE ABRAMS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

13 CV 5347

|  |  |
|---|---|
| COALITION FOR HEALTHY PORTS; AMY GOLDSMITH; NORTH SHORE WATERFRONT CONSERVANCY OF STATEN ISLAND, INC.; THE ELM PARK CIVIC ASSOCIATION, INC.; and the NATURAL RESOURCES DEFENSE COUNCIL, INC., | Case No. |
| Plaintiffs, | ECF Case |
| v. | |
| THE UNITED STATES COAST GUARD; ADMIRAL ROBERT J. PAPP, JR., in his official capacity; GARY KASSOF, in his official capacity; THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY; and PORT AUTHORITY OF NEW YORK AND NEW JERSEY BOARD OF COMMISSIONERS CHAIRMAN DAVID SAMSON, SCOTT H. RECHLER, RICHARD H. BAGGER, KENNETH LIPPER, JEFFREY H. LYNFORD, JEFFREY A. MOERDLER, BASIL A. PATERSON, RAYMOND M. POCINO, ROSSANA ROSADO, ANTHONY J. SARTOR, WILLIAM SCHUBER, and DAVID S. STEINER, in their official capacities, |  |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. This action challenges the failure of the United States Coast Guard to comply with federal environmental laws before authorizing the Port Authority of New York and New Jersey to raise the Bayonne Bridge, which connects Staten Island, New York and Bayonne, New Jersey. This project will generate substantial levels of air pollution both locally and regionally, and expose communities to hazardous contaminants such as lead, arsenic, asbestos, and polychlorinated biphenyls ("PCBs"). These environmental and public health impacts will fall disproportionately on communities near the Port, including low-income communities and communities of color in Staten Island, NY and Newark, NJ, which already experience elevated health risks from air pollution and hazardous contaminants.

2. More specifically, this action challenges the decision of defendants the United States Coast Guard and its officials (collectively, "Coast Guard") to issue a Permit Amendment pursuant to the Rivers and Harbors Act of 1899 to defendant the Port Authority of New York and New Jersey ("Port Authority") in violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("APA"), and NEPA implementing regulations, 40 C.F.R. § 1500.1 *et seq.*, 30 C.F.R. §§ 230.1 *et seq.* (2008). The Permit Amendment authorizes the Port Authority to raise the Bayonne Bridge ("Bridge").

3. The Bayonne Bridge crosses the Kill Van Kull, which is the primary shipping channel between the New York Harbor and several major cargo terminals. More than 2,000 vessels passed beneath the Bayonne Bridge en route to and from these cargo terminals in 2010.

4. Shipping companies are increasingly using larger vessels for transporting cargo between foreign ports and the U.S. The existing vertical clearance of the Bridge, however,

restricts the Port's ability to service the influx of these larger vessels. As a result, the Port Authority sought authorization from the Coast Guard to raise the roadway of the Bridge (the "Project") so that larger ships can pass under it and access the Port's west side terminals.

5. The intended purpose of the Project is to enable the Port Authority to maintain its competitive edge and handle greater cargo volumes in the future. The Port Authority has represented on a number of occasions, including to President Obama and the federal Department of Transportation, that if the Bridge is not raised, the Port Authority will lose business to other ports that are capable of handling larger ships. The Port Authority's clients, the business community, and the U.S. Environmental Protection Agency ("EPA"), among others, have made similar statements.

6. Nevertheless, when assessing the environmental impacts of the Project under NEPA, the Coast Guard concluded that raising the Bridge would have only a minimal effect on future cargo volumes at the Port. The Coast Guard concluded that Port cargo volumes would continue to grow at substantially the same rate regardless of whether the Bridge is raised. This conclusion enabled the Coast Guard to disassociate in its environmental analysis the Project from the adverse environmental and public health impacts that accompany increased Port operations.

7. Further, the Coast Guard refused to disclose the analytical data upon which its conclusion was based, thereby insulating its opinion from public scrutiny.

8. Plaintiffs conducted their own analysis and found that cargo volumes west of the Bridge would be on the order of 44% higher if the Bridge is raised. This translates to a 35% increase in cargo volumes Port-wide with the Project. These estimates are one to two orders of magnitude greater than the Coast Guard's estimates.

9.  Cargo destined for or leaving the Port is transported by diesel-powered trucks, trains, ships, and other vehicles and equipment that emit diesel pollution.  Diesel emissions are associated with premature death, aggravated asthma and other respiratory illnesses, increased risk of cancer, and heart disease, among other ailments.

10.  By enabling the Port Authority to handle greater cargo volumes, the Project will increase Port operations.  The air pollution and other environmental effects generated by these operations will disproportionately harm communities near the Port, its shipping channels, and major truck and rail corridors that already experience unacceptably high levels of air pollution and pollution exposure.  Such communities include low-income communities and communities of color in Staten Island and Newark.

11.  In 2009, the New Jersey Department of Environmental Protection ("NJDEP") reported that emissions from two west side Port terminals created elevated cancer risks for Newark and Staten Island of 30 and 63 in a million, respectively.  While a more recent NJDEP study predicts a decline in these risks by 2015, the health risks borne by Port-area communities remain extremely high when cumulative risks are considered (i.e., health risks created by air pollution from the Port combined with other non-Port sources).

12.  Data collected by the EPA show cancer risks that exceed 100 in a million in Staten Island, Newark, Bayonne, and in other communities near the Port from air pollution (excluding diesel particulates).  Had diesel particulate matter been included in EPA's analysis, the cancer risk levels would be even higher.  By way of reference, EPA strives to reduce cancer risk levels that exceed 10 in a million.

13.  The construction of the Project will take nearly four years to complete, and will occur on properties in Staten Island and Bayonne that were historically used for industrial

activities, among other things.  The Coast Guard admits that such properties may contain lead, PCBs, asbestos, and arsenic, among other contaminants.  Construction activities may expose nearby residents to these and other hazardous substances.

14.  Dense residential areas, at least seven schools, multiple churches, at least five parks, and a number of businesses may be affected by the Port's construction activities.  Approximately 10,000 Staten Island residents and approximately 7,000 Bayonne residents live in this "construction zone."

15.  Adjacent to the Project's "construction zone" in Staten Island is the "Richmond Terrace Radiological Site" where high levels of radiation were detected in 1992 and 2008.

16.  Potential exposure to hazardous contaminants is particularly concerning for residents in the North Shore of Staten Island, which was identified by EPA as one of ten "Environmental Justice Showcase Communities" in the United States because of the number of children in that community with elevated levels of lead in their blood due to former industrial uses in the area.

17.  Despite these and other concerns, which were brought to the Coast Guard and the Port Authority's attention, the Coast Guard issued the Permit Amendment to the Port on or around May 23, 2013 without completing an Environmental Impact Statement ("EIS").  NEPA requires the preparation of an EIS for major federal actions that may significantly affect the human environment.  Instead, the Coast Guard prepared an Environmental Assessment ("EA"), a document intended under NEPA to provide a basis for determining whether a full EIS is necessary, and rendered a Finding of No Significant Impact ("FONSI").

18.  The EA, on which the Coast Guard based its FONSI, violates NEPA because it fails to consider the full impact of the Project on the Port Authority's future cargo volumes, local and regional air quality and public health, and the public's potential exposure to hazardous

contaminants from construction of the Project. The EA also failed to meaningfully consider the Project's environmental justice and cumulative impacts on low-income communities and communities of color in Staten Island and Newark, and is otherwise factually and analytically flawed. The Coast Guard also violated NEPA's public participation and review requirements by relying on publicly unavailable information as a basis for its EA and FONSI, and by granting the Permit Amendment without completing an EIS.

19. This action requests declaratory and injunctive relief, including a Court order staying the Permit Amendment unless and until the Coast Guard completes a full EIS consistent with the requirements of NEPA and the APA, and an injunction precluding the Port Authority from taking any action in furtherance of the rights and authority afforded to it by the Permit Amendment.

**PARTIES**

20. Plaintiff Coalition for Health Ports ("CHP") is an unincorporated association, made up of a broad coalition of groups working together to create sustainable ports in New York and New Jersey. CHP's mission is to improve the air quality, safety, and security, as well as the working conditions, for all workers that support port commerce and to assure environmental justice and prevent harm in communities affected by port operations. CHP is governed by a steering committee that is responsible for making decisions regarding CHP's positions and activities. CHP's steering committee is made up of the New Jersey Environmental Federation, the New Jersey Environmental Justice Alliance, GreenFaith, the International Brotherhood of Teamsters, and the Ironbound Community Corporation.

21. CHP's steering committee member the New Jersey Environmental Federation is the state chapter of Clean Water Action, which is a not-for-profit membership corporation, organized under the laws of the Washington, D.C. The New Jersey Environmental Federation works to

protect natural resources and clean up pollution in New Jersey, by developing a coalition of community, environmental, student, and labor organizations to act on a broad range of environmental issues. The New Jersey Environmental Federation has over 150,000 members throughout the State of New Jersey, including members that live in Bayonne and Newark, New Jersey.

22. CHP's steering committee member the New Jersey Environmental Justice Alliance ("NJEJA") is an unincorporated association, that is an alliance of New Jersey-based organizations and individuals working together to identify, prevent, and reduce and eliminate environmental injustices that exist in communities of color and low-income communities in New Jersey. NJEJA supports community efforts to remediate, improve, and rebuild impacted neighborhoods through education, advocacy, the review and promulgation of public policies, training, organizing, and technical assistance. One of NJEJA's campaigns is focused on reducing air pollution from port operations and improving labor conditions for workers there. Several of NJEJA's members live in Newark, New Jersey.

23. CHP's steering committee member GreenFaith is a not-for-profit corporation, organized under the laws of the State of New Jersey. GreenFaith is an interfaith environmental coalition that seeks to inspire, educate, and mobilize people of diverse religious backgrounds for environmental leadership. GreenFaith believes that protecting the earth is a religious value, and that environmental stewardship is a moral responsibility. As part of this mission, GreenFaith focuses on fighting environmental injustice and racism. GreenFaith has over 700 members, some of whom live near the Bayonne Bridge in New Jersey.

24. CHP's steering committee member the Teamsters Port Division of the International Brotherhood of Teamsters is a labor union, working to bring justice to port drivers across the

country, including working to ameliorate the negative environmental impacts of the port trucking industry. The Teamsters Port Division strives to transform the port trucking industry into a good and green industry that is sustainable for workers and the nearby communities. The International Brotherhood of Teamsters has 1.4 million members and hundreds of local Teamsters unions across North America, including numerous members that live in Staten Island and Bayonne, including close to the Bayonne Bridge.

25. CHP's steering committee member the Ironbound Community Corporation is a not-for-profit corporation, organized under the laws of the State of New Jersey. The Ironbound Community Corporation is a community services organization, whose mission is to engage and empower individuals, families, and groups in realizing their aspirations and, together, work to create a just, vibrant, and sustainable community. Programs of the Ironbound Community Corporation include a pre-school program, an after-school program, family services, and working to improve the quality of air, water, and green space in the community. The Ironbound Community Corporation serves 800 to 1,000 people a day that live in Newark, New Jersey.

26. Plaintiff Amy Goldsmith is the Chairperson of CHP. She is also State Director of the New Jersey Environmental Federation, which, as noted above, is a member of CHP's steering committee. As Chair, Ms. Goldsmith's duties include serving as the spokesperson for CHP, facilitating all the meetings, writing grant proposals and overseeing fulfillment of grant requirements, leading strategy and decisionmaking, and serving as the liaison between CHP and the media and other external entities. CHP does not have a President or Treasurer, but as Chair, Ms. Goldsmith serves as the functional equivalent of a President.

27. Amy Goldsmith and CHP bring this action on behalf of CHP's steering committee organizations and their members who live, work, and recreate in and around Staten Island, NY,

8

and Bayonne and Newark, NJ, and surrounding areas and who will suffer the harmful effects of the Project. The excess air pollution, exposure to hazardous contaminants, and other deleterious environmental effects of the Project will injure the health of CHP's steering committee organizations' members, their livelihood, their quality of life, and their recreational enjoyment of the region. Further, the Coast Guard's failure to adequately study and disclose all of the environmental impacts of the Project has effectively denied CHP and its steering committee organizations' members access to relevant information about the Project. The declaratory and injunctive relief Amy Goldsmith and CHP seek under NEPA will redress the injuries to CHP's organizations and their members by requiring the Coast Guard to fully consider and provide to the public and other government decisionmakers information about the anticipated environmental and public health impacts of the Project, and to identify mitigation measures that will minimize or avoid those impacts.

28. Plaintiff Natural Resources Defense Council, Inc. ("NRDC") is a national, not-for-profit membership corporation organized under the laws of the State of New York, with offices in New York; Washington, D.C.; Los Angeles; San Francisco; Chicago; and Beijing, China. NRDC is dedicated to the preservation, protection, and defense of the environment, public health, and natural resources. NRDC is actively involved in efforts to reduce the environmental, public health, and community impacts of our nation's freight transportation system—the network of ships, trucks, trains, and other cargo handling equipment that move freight throughout our country. NRDC has also long been active in working to protect air quality and specifically, to reduce the public health effects generated by diesel exhaust.

29. Founded in 1970, NRDC has more than 363,700 members nationwide, including over 31,000 who live in the State of New York and over 11,000 who live in the State of New

Jersey.  In addition to NRDC's members throughout the two states, NRDC also specifically has members in Newark, Bayonne, and Staten Island, including several members who live close to the Bayonne Bridge.

30.  NRDC brings this action on behalf of its members who live, work, and recreate in New York and New Jersey, in and around Staten Island, NY, and Bayonne and Newark, NJ, and surrounding areas and who will suffer the harmful effects of the Project.  The excess air pollution, exposure to hazardous contaminants, and other deleterious environmental effects of the Project will injure the health of NRDC's members, their livelihood, their quality of life, and their recreational enjoyment of the region.  Further, the Coast Guard's failure to adequately study and disclose all of the environmental impacts of the Project has effectively denied NRDC's members access to relevant information about the Project.  The declaratory and injunctive relief NRDC seeks under NEPA will redress the injuries to NRDC's members by requiring the Coast Guard to fully consider and provide to the public and other government decisionmakers information about the anticipated environmental and public health impacts of the Project, and to identify mitigation measures that will minimize or avoid those impacts.

31.  Plaintiff the North Shore Waterfront Conservancy of Staten Island, Inc. ("NSWC") is a not-for-profit membership corporation organized under the laws of the State of New York. NSWC is a community based, grassroots organization, whose mission is to advance and promote increased safe and sustainable public access to the waterfront; build healthier, greener communities along the Kill Van Kull; and advance public policies and laws that are inclusive of the needs of Staten Island's North Shore environmental justice communities and waterfront communities.  The North Shore community surrounds the Staten Island foot of the Bayonne Bridge.

32.  NSWC has over 100 members, including several who live close to the Bayonne Bridge and several more who live in surrounding neighborhoods.

33.  NSWC brings this action on behalf of its members who live, work, and recreate in and around Staten Island, NY and who will suffer the harmful effects of the Project.  The excess air pollution, exposure to hazardous contaminants, and other deleterious environmental effects of the Project will injure the health of NSWC's members, their livelihood, their quality of life, and their recreational enjoyment of the region.  Further, the Coast Guard's failure to adequately study and disclose all of the environmental impacts of the Project has effectively denied NSWC's members access to relevant information about the Project.  The declaratory and injunctive relief NSWC seeks under NEPA will redress the injuries to NSWC's members by requiring the Coast Guard to fully consider and provide to the public and other government decisionmakers information about the anticipated environmental and public health impacts of the Project, and to identify mitigation measures that will minimize or avoid those impacts.

34.  Plaintiff the Elm Park Civic Association, Inc. is a not-for-profit membership corporation organized under the laws of the State of New York, made up of residents living in Staten Island's North Shore community.  The Elm Park Civic Association advocates for the balance of the maritime industry with proper environmental stewardship and public access, and seeks to promote the interests of the community of Elm Park.

35.  The Elm Park Civic Association has more than 30 members, including members who live close to the Bayonne Bridge.

36.  The Elm Park Civic Association brings this action on behalf of its members who live, work, and recreate in and around Staten Island who will suffer the harmful effects of the Project.  The excess air pollution, exposure to hazardous contaminants, and other deleterious

11

environmental effects of the Project will injure the health of the Association's members, their livelihood, their quality of life, and their recreational enjoyment of the region. Further, the Coast Guard's failure to adequately study and disclose all of the environmental impacts of the Project has effectively denied the Association's members access to relevant information about the Project. The declaratory and injunctive relief the Association seeks under NEPA will redress the injuries to the Association's members by requiring the Coast Guard to fully consider and provide to the public and other government decisionmakers information about the anticipated environmental and public health impacts of the Project, and to identify mitigation measures that will minimize or avoid those impacts.

37. Defendant the United States Coast Guard is an agency of the United States Government that operates under the Department of Homeland Security. As a federal agency, the Coast Guard must comply with federal law, including NEPA. The Permit Amendment at issue in this case was issued by the Coast Guard's First District, located at Battery Park Building, One South Street, NY, NY 10004.

38. Defendant Admiral Robert J. Papp, Jr. ("Admiral Papp") is the Commandant of the Coast Guard. He is the Coast Guard's top service official, responsible for all world-wide Coast Guard activities. He is responsible for ensuring that the Coast Guard, including officials and employees under his supervision, comply with all applicable federal laws, including NEPA. Admiral Papp is sued in his official capacity.

39. Defendant Gary Kassof is the Commander and Bridge Program Manager of the Coast Guard's First District. He oversees the activities of the First District, and is responsible for ensuring that the Coast Guard, including officials and employees under his supervision, comply

with all applicable federal laws, including NEPA.  Mr. Kassof signed the Final EA and FONSI for the Project, and is sued in his official capacity.

40.  Defendant the Port Authority of New York and New Jersey ("Port Authority") is a bi-state agency that is governed by a Board of Commissioners, appointed by the governors of New York and New Jersey.  The Port Authority is the project applicant that sought the Permit Amendment from the Coast Guard, to allow the Port Authority to raise the roadway of the Bayonne Bridge.  The Port of New York and New Jersey consists of the waterbodies, shipping channels, passenger terminals, and container and cargo facilities located around the New York Harbor.  The Port includes four container facilities: Howland Hook Marine Terminal, Port Jersey Marine Terminal, Port Newark-Elizabeth Marine Terminal (sometimes referred to as two separate terminals), and Brooklyn Marine Terminal.  Combined, these facilities constitute the third busiest port in the U.S. and the largest on the Eastern Seaboard.

41.  Defendants the Port Board of Commissioners Chairman David Samson, Scott H. Rechler, Richard H. Bagger, Kenneth Lipper, Jeffrey H. Lynford, Jeffrey A. Moerdler, Basil A. Paterson, Raymond M. Pocino, Rossana Rosado, Anthony J. Sartor, William Schuber, and David S. Steiner manage the Port Authority.  As Commissioners, they are responsible for ensuring that the Port Authority, its officials, and its employees, comply with all applicable federal laws, including NEPA.  The Commissioners are sued in their official capacity.

## JURISDICTION AND VENUE

42.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201–2202 (declaratory judgment), and 5 U.S.C. §§ 701–706 (Administrative Procedure Act).

43.   Venue in this Court is proper under 28 U.S.C. § 1391(e) because this is a civil action brought against an agency of the United States and its officers and employees acting in their official capacity and under the color of legal authority, the Permit Amendment at issue was issued by the First District of the Coast Guard located within the Southern District, and the Port Authority's headquarters is located within the Southern District.

## LEGAL BACKGROUND

### National Environmental Policy Act

44.   NEPA was enacted in 1970 and is the United States' "basic national charter for protection of the environment." 42 U.S.C. §§ 4321 *et seq.*; 40 C.F.R. § 1500.1.  NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions.

45.   The Council on Environmental Quality ("CEQ") has promulgated regulations for implementing NEPA.  40 C.F.R. §§ 1500–1508.

46.   The Coast Guard also has procedures for implementing NEPA.  U.S. Coast Guard, Tools for Decision-Making: Environmental Considerations ("Coast Guard NEPA Handbook"); U.S. Coast Guard, NEPA Implementing Procedures and Policy for Considering Environmental Impacts, Commandant Instruction M16475.1D (Nov. 29, 2000) ("Commandant Instruction M16475.1D").[1]

47.   NEPA requires federal agencies to prepare, consider, and approve an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An EIS analyzes the potential environmental effects, alternatives, and mitigation

---

[1] The Coast Guard's NEPA Handbook is available at http://www.uscg.mil/hq/cg4/cg47 /docs/NEPA_handbook.pdf, and the Commandant Instruction M16475.1D is available at http://www.uscg.mil/hq/cg4/cg47/docs/M16475.1D.USCG.NEPA%20Instruction.pdf.

opportunities for major federal actions. *Id.* § 4332; 40 C.F.R. §§ 1502.1; 1502.16(a)–(b), (d), (h) 1508.25 (b), (c); 1502.14.

48.  Significant effects need not be certain to occur to trigger an EIS.

49.  Determining whether an impact is "significant" requires consideration of the impact's context and intensity. *Id.* § 1508.27. The "context" of the impact refers to, for example, "the affected region, the affected interests, and the locality." *Id.* § 1508.27(a). "Intensity" refers to the severity of the impact. *Id.* § 1508.27(b).

50.  In assessing "intensity" to determine whether an EIS is required, the CEQ regulations direct agencies to consider, among other factors, the degree to which the proposed action affects public health, *id.* § 1508.27(b)(2); the unique characteristics of the geographic area such as proximity to park lands or wetlands, *id.* § 1508.27(b)(3); the degree to which the effects on the environment are highly controversial, *id.* § 1508.27(b)(4); the degree to which the possible effects on the environment are uncertain or involve unique or unknown risks, *id.* § 1508.27(b)(5); whether the action is related to other actions with individually insignificant but cumulatively significant impacts, *id.* § 1508.27(b)(7); and whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment, *id.* § 1508.27(b)(10).

51.  When it is unclear whether a proposed action may yield significant impacts and thus trigger an EIS, federal agencies are required to prepare an EA. An EA should "provide sufficient evidence and analysis for determining whether to prepare an [EIS]," and must analyze the need for the proposal, and the environmental effects of the proposed action and alternatives. 40 C.F.R. § 1508.9(a), (b); *see also* Commandant Instruction M16475.1D, at 2-6 to 2-7; Coast Guard NEPA Handbook 23, 34.

52.  If the EA concludes that a proposed action will not have a significant effect on the environment, the federal agency prepares a "finding of no significant impact." 40 C.F.R. § 1508.13.

53.  Among other things, NEPA requires federal agencies to consider the proposed action's ecological, aesthetic, historic, cultural, economic, social, and health impacts, whether direct, indirect, or cumulative.  40 C.F.R. § 1508.8.  An action's "direct effects" are impacts that are caused by the action and occur at the same time and place.  "Indirect effects" are reasonably foreseeable impacts caused by the action, but later in time or farther removed in distance, and which may include "growth inducing effects . . . related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id.* § 1508.8(a), (b).

54.  Federal agencies must also analyze a proposed action's "cumulative impact," which is defined as the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions." *Id.* § 1508.7.  "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*; Coast Guard NEPA Handbook at 42.

55.  Federal agencies must also consider the proposed action's environmental justice impacts under Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," which requires federal agencies to "identify[] and address[], as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."  59 Fed. Reg. 7629 (1994).

56.  Disproportionately high and adverse impacts are project effects that are significant and will have an adverse impact on minority or low-income populations that appreciably exceeds that on the general population.  The determination of disproportionately high and adverse impacts should reflect the potentially impaired resiliency of the affected population and also consider existing, multiple, and cumulative environmental burdens on the affected populations. Council on Environmental Quality, Environmental Justice: Guidance under the National Environmental Policy Act (1997).[2]

57.  When analyzing a proposed action's environmental justice impacts, federal agencies should consider "relevant public health data and industry data concerning the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population and historical patterns of exposure to environmental hazards . . .  Agencies should consider these multiple, or cumulative effects, even if certain effects are not within the control or subject to the discretion of the agency proposing the action." *Id.* at 9.

58.  "[I]dentification of a disproportionately high and adverse human health or environmental effect on a low-income population [or] minority population . . . .  should heighten agency attention to . . . mitigation strategies, monitoring needs, and preferences expressed by the affected community or population." *Id.* at 10.

59.  Executive Order 12898 also requires federal agencies to ensure greater public participation in agency decisionmaking.  59 Fed. Reg. 7630.

60.  In February 2012, the Department of Homeland Security ("DHS") released its Environmental Justice Strategy, which is intended to meet the goals of Executive Order 12898, requiring each federal agency to make environmental justice part of its mission by identifying

---

[2] The CEQ Guidance on Environmental Justice and NEPA is available at http://www.epa.gov/ environmentaljustice/resources/policy/ej_guidance_nepa_ceq1297.pdf.

and addressing any disproportionately high and adverse human health and environmental effects of its programs, policies, or activities on minority or low-income populations. DHS, Environmental Justice Strategy, 2 (Feb. 2012).[3]

61. NEPA's primary purposes are to "insure that environmental information is available to public officials and citizens before decisions are made and actions are taken"; and to "help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b)–(c) (emphasis added). Hence, public participation in the NEPA process and disclosure of environmental documents to the public for review and comment is critically important. *Id.* § 1506.6.

62. Federal agencies are instructed to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." *Id.* § 1506.6(a). When an EA is prepared, federal agencies "shall involve environmental agencies, applicants, and the public, to the extent practicable" in the preparation of an EA. *Id.* § 1501.4(b).

63. CEQ further instructs that "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* § 1500.1(b).

64. To that end, material may be incorporated by reference into an EIS, but only if it does not "imped[e] . . . public review of the action" and the material is "reasonably available for public inspection by potentially interested persons within the time allotted for comment." *Id.* § 1502.21. "Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference." *Id.*

---

[3] The DHS' Environmental Justice Strategy is available at http://www.dhs.gov/xlibrary/ assets/mgmt/dhs-environmental-justice-strategy.pdf.

**Administrative Procedure Act**

65.  The APA governs judicial review of an agency's compliance with NEPA.  A court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

**The Port's Proposal to Raise the Bayonne Bridge**

66.  There is a growing international trend in the shipping industry to use larger ships to transport cargo.  The Panama Canal is currently undergoing construction that will enable larger ships to travel from Asia, through the Canal, to the east coast of the U.S.  This expansion is expected to be completed in 2015.  These larger ships can carry 12,000 TEUs,[4] which is more than double the amount of cargo that can be carried by the largest ships that currently travel the Panama Canal.  The new "post-Panamax" ships are 1,200 feet long and have a keel-to-mast height of 190 feet.

67.  The expansion of the Panama Canal will likely lead to a change in shipping patterns, as some cargo that had previously been sent to west coast ports in the U.S. and then transported by train across the country to the east coast will instead be transported on these larger ships through the Panama Canal and directly to east coast ports.

68.  As a result, ports around the country, including the Port Authority's competitors, have been making infrastructure improvements to accommodate these larger ships and, ultimately, to increase the amount of cargo handled at their facilities.

---

[4] A TEU, or a "twenty-foot equivalent unit," is the measurement often used to describe a cargo container used for shipping cargo, that is 20 feet long and can be easily transferred between different modes of transportation, such as ships, trains, and trucks.

69. On or around November 8, 2011, the Port Authority filed an application with the Coast Guard for a Permit Amendment to raise the Bayonne Bridge. The Permit Amendment is required pursuant to the Rivers and Harbors Act of 1899.

70. The Bayonne Bridge is located over the Kill Van Kull and connects Staten Island, NY and Bayonne, NJ. The Bridge carries state highway 440. The Kill Van Kull is a primary shipping channel of the Port and one of the busiest in the world.

71. The existing vertical clearance of the Bridge is too low to accommodate the passage of large, post-Panamax vessels. The Port Authority seeks to raise the Bridge by approximately 65 feet so that post-Panamax ships can pass under it to access the Port Authority's shipping terminals west of the Bridge. The Port Authority's busiest container terminals and the terminals anticipated to see the most future growth are located west of the Bridge.

72. The Port Authority has maintained on a number of occasions that it needs to raise the Bridge in order to make the Port more attractive to shipping companies, to enable the Port to remain competitive with other ports, to prevent the loss of business to other ports that can accommodate post-Panamax ships, and to increase cargo volumes at the Port.

73. For example, in 2010, the Port Authority submitted a TIGER grant application to the U.S. Department of Transportation, requesting $3 million to analyze the environmental impacts of raising the Bridge. The Port Authority based its application in part on the economic need for the Project. The Port Authority stated that the Project "is crucial for maintaining and developing the regional economies of New York and New Jersey," and that failing to raise the Bridge "may damage the economies of New York and New Jersey, as shipping companies will be encouraged

to divert to ports capable of handling larger, economically efficient vessels."[5]  The Port

Authority's application went on to assert that "[g]iven existing Bayonne clearance restriction, the

potential that post Panamax vessels will not be able to call at the Port of New York and New

Jersey, and they could divert to ports outside of the region that are able to accommodate those

vessels, may result in a loss of economic activity in the region."[6]

74.  On March 23, 2013, the Port Authority made similar representations to President

Obama when requesting that the President "fast track" the Project: "Raising the bridge roadway

is crucial to maintaining the Port's position as the third largest port in the country."[7]

**Construction of the Project will Harm Communities in Staten Island and Bayonne**

75.  According to the Coast Guard, construction of the Project will take nearly four years

to complete.

76.  Construction will raise the Bridge by approximately 65 feet at its centerline, build

new piers on both sides of the Bridge, and increase the grade of the approaches and interchanges

from New York and New Jersey.  Construction will take place on the Bridge and almost a mile

in each direction along the roadway, into Staten Island and Bayonne.  Construction will entail,

among other things, demolition of parts of the existing Bridge structure, excavation and removal

of existing soil, and dewatering of groundwater.

77.  According to the Coast Guard, lead, asbestos, PCBs, and arsenic, among other

hazardous contaminants and materials, may exist at various levels in the soil, groundwater, and

structures in numerous parcels of land where construction will occur (the "construction zone").

---

[5] TIGER II Planning Grant Application: Bayonne Bridge Navigational Clearance Program, Prepared for Submission by The Port Authority of NY and NJ, at 3.
[6] *Id.* at 5.
[7] Letter from Patrick J. Foye, Executive Director, The Port Authority of NY & NJ, to the Honorable Janet Napolitano, Secretary, U.S. Department of Homeland Security, and the Honorable Ray LaHood, Secretary, U.S. Department of Transportation (March 23, 2012) at 2.

Construction activities will disturb, unearth, and/or otherwise expose these contaminated materials.

78.   Adjacent to the construction zone in Staten Island is the "Richmond Terrace Radiological Site" where high levels of radiation were detected in 1992 and 2008.

79.   The Coast Guard reports that if adverse exposure to hazardous contaminants occurs, it will likely be from breathing volatile/semi-volatile compounds or particulate-laden air released during demolition, excavation, and other construction activities.

80.   Dense residential areas, at least seven schools, multiple churches, at least five parks, and a number of businesses are located within one-quarter mile of the construction zone (the "Study Area").   Approximately 10,000 Staten Island residents and approximately 7,000 Bayonne residents live within the Study Area.

81.   In Staten Island, the playground of a public school is located in close proximity to the construction zone.   In Bayonne, two parks, including a playground and two little league baseball fields, are located within the construction zone and would need to be closed during construction.

**Operation of the Project will Harm Communities, including Communities in Staten Island, Newark, and Bayonne**

82.   The Project is intended to enable the Port Authority to handle increased cargo volumes at terminals west of the Bridge.

83.   The movement of cargo west of the Bridge includes ships carrying cargo under the Bridge, and trucks, trains, and other cargo handling equipment moving the cargo from the Port's west side terminal docks to inland destinations, and vice versa.

84.   Ships traveling under the Bridge will directly pass Staten Island and Bayonne.

85. A number of the primary rail lines and truck routes used to carry cargo to and from the Port are located in Newark, Staten Island, and Bayonne.

86. Ships, trucks, trains, and other vehicles and equipment that move Port cargo are generally powered by diesel fuel, and their engines emit, among other things, diesel particulate matter ("diesel PM") and ozone-forming nitrogen oxides and volatile organic compounds.

87. Inhalation of ozone and diesel PM are associated with a host of health ailments, including premature death, aggravated asthma and other respiratory illnesses, increased risk of cancer, and heart disease.

88. Communities surrounding the Port are already harmed by air pollution generated by Port operations. In 2009, the NJDEP reported that emissions from two west side Port terminals created elevated cancer risks for Newark and Staten Island of 30 and 63 in a million, respectively. While a more recent NJDEP study predicts a decline in these risks by 2015, the health risks borne by port-area communities remain extremely high when cumulative risks are considered (i.e., health risks created by air pollution from the port combined with other non-port sources).

89. Data collected by the EPA shows cancer risks that exceed 100 in a million in Staten Island, Newark, Bayonne, and in other communities near the Port from all air pollution (excluding diesel particulates). Had diesel PM been included in EPA's analysis, the cancer risk levels would be even higher. By way of reference, EPA strives to reduce cancer risk levels that exceed 10 in a million.

90. Given that the Project will result in greater cargo volumes at the Port, these communities will experience greater levels of air pollution from increased Port operations.

**The Coast Guard's Decision to Issue the Permit Amendment Without Preparing an EIS**

91. On January 18, 2013, the Coast Guard issued a public notice of the Port Authority's application for a Permit Amendment.

92. In September 2011, the Coast Guard issued a NEPA Workplan for the Project. The Workplan provided an overview of the Project, its purpose, alternatives, and anticipated environmental effects.

93. Plaintiffs including CHP submitted comments to the Coast Guard on the Workplan.

94. On January 4, 2013, the Coast Guard issued a Draft EA. The Draft EA concluded that the Project would not have any significant impacts on the quality of the human environment, and thus, preparation of an EIS was not required.

95. The Coast Guard received numerous comments on its Draft EA, including comments from Plaintiffs CHP (including separate comments from CHP's member organizations GreenFaith, Ironbound Community Corporation, New Jersey Environmental Federation, and the New Jersey Environmental Justice Alliance), Elm Park Civic Association, North Shore Waterfront Conservancy of Staten Island, and NRDC, expressing concerns about the Project, including the concerns raised herein.

96. On May 16, 2013, the Coast Guard issued a Final EA and a FONSI. The Final EA largely adopted the findings and conclusions in the Draft EA.

97. On information and belief, the Coast Guard issued the Bridge Permit Amendment to the Port Authority on or around May 23, 2013.

**Deficiencies in the Final EA and FONSI, and in the Coast Guard's Decision Not to Prepare an EIS**

98.  The Final EA and FONSI, and the Coast Guard's decision not to prepare an EIS, are deficient in many respects.  Among other things, the substantial public controversy created by the Project itself warranted preparation of an EIS.

### *The Final EA's induced demand analysis impermissibly relied on nonpublic information*

99.  The Coast Guard performed an "induced demand" analysis to determine if the Project could lead to increased cargo volumes at the Port.  The induced demand analysis looked at the Project's potential to induce growth at the Port by indirectly resulting in cost savings to shippers by accommodating larger post-Panamax ships.  The Coast Guard concluded that the Project will have only a minimal impact on future cargo volumes, and that the Port Authority's forecasted increase in cargo volumes would be substantially met regardless of whether or not the Bridge is raised.

100.  Specifically, the Final EA concludes that the Project will induce approximately 92,400 TEUs port-wide, or 74,000 TEUs at terminals west of the Bridge.  This amounts to 0.7% of the 10.65 million TEUs expected to arrive at terminals west of the Bridge in 2035.  The Final EA concludes that Project-induced TEUs will result in a negligible increase in truck and rail traffic, and do not have a potential for creating significant environmental effects.

101.  The Coast Guard relied on the "Halcrow Model" to derive its induced demand estimates.  The Halcrow Model relies on a number of variables, including certain "price elasticities," to determine whether raising the Bridge will result in cargo going to the Port that would otherwise be handled at other ports.

102.  Despite requests by the Plaintiffs and EPA that the Coast Guard substantiate its induced demand estimates, the Coast Guard refused to make the Halcrow Model publicly available.  The Final EA states that the Halcrow Model is "proprietary information and cannot be released publicly."

103.  The Coast Guard also refused to substantiate the basis for its induced demand estimates, by, among other things, failing to explain how its price elasticities were derived despite requests to do so during the NEPA process.

104.  By failing to disclose the basis for its induced demand estimates, the Coast Guard insulated its induced demand analysis from public review and denied the public the opportunity to meaningfully comment on the Coast Guard's Final EA and FONSI.

105.  The Coast Guard's failure to disclose the basis of its analysis has precluded Plaintiffs from being able to test, replicate, or verify the Final EA's conclusions with respect to induced demand.

### The Final EA's induced demand analysis is inadequate

106.  In addition to being based on information that was not made publicly available during the NEPA comment period, the Final EA's induced demand analysis suffers from a number of further deficiencies.

107.  For example, the induced demand analysis utilizes an incorrect "baseline" or "no-project alternative" that concludes that the Port Authority's cargo volumes for terminals west of the Bridge will be substantially the same, with or without the Project.

108.  This conclusion is contrary to the Port Authority's representations to the Department of Transportation and President Obama that, as discussed above, the Bridge is a

critical infrastructure project that will enable the Port Authority to remain competitive with other ports, and is necessary for future cargo growth.

109.  This conclusion is also inconsistent with the Port Authority's previous analyses for analogous projects, where the Port Authority concluded that infrastructure restrictions that limit the size of ships that can access the Port can significantly reduce overall cargo throughput at the Port, especially when other ports are undergoing simultaneous improvements.

110.  This conclusion is also inconsistent with statements made by the Port Authority's customers, including members of the shipping and retail industry, among others, during the NEPA process that, absent the Project, cargo will be diverted to other ports and the Port will become less competitive.

111.  This conclusion is also contrary to statements in the Final EA about the Project's purpose and need.

112.  EPA, other government agencies, and Plaintiffs raised concerns about the Coast Guard's induced demand estimates on numerous occasions during the NEPA process.

113.  Plaintiffs conducted their own analysis and found that cargo volumes west of the Bridge would be on the order of 44% higher if the Bridge is raised.  This translates to a 35% increase in cargo volumes Port-wide with the Project.  These estimates are one to two orders of magnitude greater than Coast Guard's 0.7% Port-wide difference reported in the Final EA.

114.  In response to concerns raised about the Project's potential to increase future cargo volumes at the Port, the Port Authority entered into a Memorandum of Agreement with the NJDEP for the implementation of various air quality measures.  The agreement, however, contains a number of deficiencies demonstrating that it is unlikely to remedy anticipated increases in air pollution from the Project.  For example, the agreement largely includes

measures that the Port Authority previously committed to adopting years ago, and contains terms that make the implementation of additional new mitigation unlikely.

115.  By minimizing the Project's effects on future cargo volumes at the Port, the Final EA underestimates how the Project may increase port operations, including increased cargo movements by diesel trucks, trains, and cargo handling equipment, and how communities near the Port will be harmed.

116.  By underestimating the future cargo volumes attributable to the Project, the Final EA's conclusions with respect to the Project's impacts on air quality, transportation, greenhouse gases, environmental justice, and cumulative impacts, among others, are erroneous.

### The Final EA's hazardous contaminant analysis is inadequate

117.  The Final EA identified more than two dozen properties in Staten Island and Bayonne that may be affected by construction of the Project.  The Coast Guard concluded that "[t]he project site and vicinity were historically developed with industrial activities that are known to have caused subsurface contamination and other activities that may have caused contamination."

118.  The Final EA also reports the presence of groundwater monitoring wells in Staten Island and Bayonne, and states that "[t]he presence of [such] wells . . . indicate[s] the potential for contamination."

119.  The Final EA reports the presence of fourteen Recognized Environmental Conditions ("RECs") within properties owned by the Port and seven RECs within non-Port-owned properties, which are all within the construction zone.  RECs are defined in Appendix G of the Final EA as "the presence or likely presence of any hazardous substances or petroleum products on property under conditions that indicate an existing release, a past release, or a

material threat of a release of any hazardous substances or petroleum products, including natural gas, into structures on the property or in the ground, groundwater or surface water of the property." Further, the Final EA states that "the term [REC] is not intended to include *de minimis* conditions . . ."

120. The RECs identified in the Final EA include lead, PCBs, arsenic, asbestos, underground storage tanks, rail tracks and spur, and soil stockpiles, among other conditions. Construction activities would affect some or all of these RECs.

121. The health risks associated with exposure to the hazardous contaminants identified in the Final EA are well documented.

122. For example, according to EPA, lead at high levels can cause convulsions, coma, and even death. Lower levels of lead can cause adverse health effects on the central nervous system, kidney, and blood cells. Humans can be exposed to lead through, for example, the air, drinking water, food, contaminated soil, deteriorating paint, and dust. The effects of lead exposure on fetuses and young children can be severe, and include delays in physical and mental development, lower IQ levels, shortened attention spans, and increased behavioral problems. Fetuses, infants, and children are more vulnerable to lead exposure than adults since lead is more easily absorbed into growing bodies, and the tissues of small children are sensitive to the damaging effects of lead. Children may have higher exposures since they are more likely to get lead dust on their hands and then put their fingers or lead-contaminated objects into their mouths. In 1991, the Secretary of the Department of Health and Human Services called lead the "number one environmental threat to the health of children in the United States."

123. According to EPA, PCBs have been demonstrated to cause a variety of serious health effects. PCBs have been shown to cause cancer in animals and a number of serious non-

cancer health effects in animals, including effects on the immune system, reproductive system, nervous system, endocrine system, and other health effects. Studies in humans provide supportive evidence for potential carcinogenic and non-carcinogenic effects of PCBs. A number of epidemiological studies of workers exposed to PCBs have been performed and found increases in rare liver cancers and malignant melanoma.

124. EPA classifies inorganic arsenic as a human carcinogen. Inorganic arsenic exposure to humans, by the inhalation route, has been shown to be strongly associated with lung cancer, while ingestion of inorganic arsenic by humans has been linked to a form of skin cancer and also to bladder, liver, and lung cancer. Acute (short-term) high-level inhalation exposure to arsenic dust or fumes has resulted in gastrointestinal effects and central and peripheral nervous system disorders. Chronic (long-term) inhalation of arsenic of humans is associated with irritation of the skin and mucous membranes and effects in the brain and nervous system. Chronic oral exposure to elevated levels of inorganic arsenic has resulted in gastrointestinal effects, anemia, peripheral neuropathy, skin lesions, hyperpigmentation, and liver or kidney damage in humans.

125. Hazardous contaminants located at properties adjacent to the construction zone are also of concern. The Final EA reports that adjacent properties upgradient from the project site have the potential to affect the project site, and that such properties were historically used for a range of industrial and commercial operations, including manufacturing, gasoline stations, and automotive uses.

126. The "Richmond Terrace Radiological Site" in Staten Island is also adjacent to the construction zone. High levels of radiation were detected at that property in 1992 and 2008.

127.  The Final EA reports that dense residential areas, at least seven schools, multiple churches, at least five parks, and a number of businesses are located within one-quarter mile of the construction zone.  Approximately 10,000 Staten Island residents and approximately 7,000 Bayonne residents live within this area.

128.  The Coast Guard further reports that should exposure occur, it would mostly likely be "through breathing volatile/semi-volatile compounds or particulate-laden air released during demolition, excavation, and construction activities."

129.  The Final EA also reports that "[f]ollowing construction of the project, there would be no significant potential for continued exposure," implying the potential for significant exposure during construction.

130.  Plaintiffs raised concerns to the Coast Guard during the NEPA process about how construction of the Project could expose the public to hazardous contaminants.

131.  However, the Final EA fails to assess and disclose if there is a potential for significant health risks from exposure to hazardous contaminants from construction activities for residents in Staten Island and Bayonne.  Instead, the Final EA defers this assessment and consideration of mitigation until after construction commences.

132.  For example, the Final EA relies on a Construction Health and Safety Plan ("CHASP") and other vaguely defined measures to address the construction zone's known and suspected contamination.  However, the Final EA does not describe these measures with any specificity, analyze whether these measures will be effective to reduce the potential for harm, or include procedures to monitor the measures' effectiveness.  Such considerations should have been undertaken by the Coast Guard before it issued a FONSI and the Permit Amendment.

133.  In short, the Coast Guard failed to consider the potential for significant impacts from exposure to hazardous contaminants or provide the necessary assurances that any such impacts will be reduced to insignificance.

### The Final EA fails to adequately analyze how the Project construction will affect environmental justice on Staten Island

134.  As part of the Final EA's environmental justice chapter, the Coast Guard studied thirteen census block groups in Staten Island and Bayonne within one-quarter mile of the Project to determine if minority or low-income communities reside in this Study Area.  All of these thirteen block groups are located directly adjacent to or include portions of the construction zone, and encompass the area where the Coast Guard believes any potentially significant impacts may occur.

135.  Of the thirteen census blocks groups examined, the Coast Guard identified seven of these block groups as minority populations or communities of concern for environmental justice. All seven of these block groups are in Staten Island.  These block groups have minority populations ranging from 67.6 to 88.5%, which is meaningfully greater than the Council on Environmental Quality's 50% threshold for identifying minority populations, and also meaningfully greater than in the Study Area as a whole (59%) and Staten Island as a whole (36%).  Hispanics and African Americans are the largest racial and ethnic minority populations identified in these block groups.

136.  Of the Study Area's thirteen census block groups, five were identified as low income populations.  Four of these five block groups were also minority communities and in Staten Island.  The percentage of individuals living below the poverty level in these areas ranged as high as 43%, which is meaningfully greater than the Study Area as a whole (14.5%).  The

remaining low-income block group is located in Bayonne and is not considered a minority population.

137.  The Final EA also referenced EPA's identification of the North Shore of Staten Island as an Environmental Justice Showcase Community, and indicated that more sensitive receptors would be affected by construction activities in Staten Island than in Bayonne.

138.  As discussed above, data from NJDEP and EPA demonstrate that Staten Island is disproportionately affected by air pollution, including emissions from Port operations.

139.  The Final EA concedes that there are hazardous contaminants, including lead, arsenic, and PCBs, among other RECs, in and around the construction zone, and that potential disturbance of these hazardous contaminants will take place in close proximity to minority and low-income communities in Staten Island.

140.  EPA and the Plaintiffs raised concerns about how the Project's construction and operational impacts could disproportionately affect minority and low-income communities in Staten Island and urged the Coast Guard to carefully analyze the Project's environmental justice impacts on this community.

141.  Nevertheless, the Final EA did not analyze the existing human health and environmental hazards in the Staten Island community; did not analyze how Staten Island, as an environmental justice community, would be affected by, for instance, air pollution or possible increased exposure to hazardous contaminants, especially given its past exposure to lead; and did not consider mitigation measures that would address the unique health risks experienced by that community.

***The Final EA fails to analyze how the Project's operation will affect environmental justice in Newark***

142. The Final EA concludes that the Project will result in an additional 74,000 TEUs arriving at terminals west of the Bridge in 2035. These additional TEUs translate into at least 54 additional truck trips per day and the movement of at least 136 additional rail containers daily west of the Bridge. Stated differently, this translates into at least 14,000 new diesel truck trips annually and the movement of at least 35,000 rail containers annually west of the bridge. As discussed above, Plaintiffs' analysis found that cargo volumes west of the Bridge would be one to two orders of magnitude greater than the Coast Guard's estimates.

143. Newark is located northwest of the Bayonne Bridge and is traversed by busy truck routes and rail lines that are used to transport cargo to and from the Port. For example, I-95 and I-78 pass through two communities in Newark—the East Ward and South Ward—and handle an annual average of 24,000 truck trips daily.

144. Ships traveling west under the Bayonne Bridge deliver cargo to the largest and busiest cargo facilities in the Port. In 2010, more than 2,085 vessels and more than 4.86 million TEUs passed beneath the Bayonne Bridge en route to and from these terminals.

145. Newark as a whole, and particularly the East Ward, is home to a number of stationary sources of pollution, including various kinds of manufacturing facilities.

146. The East and South Wards are also adjacent to the Newark Liberty International Airport.

147. Newark, including the East and South Wards, is an environmental justice community. Newark contains high concentrations of populations of color and families living in poverty when compared to populations residing in the State of New Jersey and the New York/New Jersey metropolitan area.

34

148.  The Final EA acknowledges that "[t]he Port terminals west of the Bayonne Bridge are within areas classified as environmental justice communities."

149.  Health risks for communities in Newark from air pollution, including Port-generated emissions, are well-documented.  NJDEP and EPA, as described above, have reported elevated cancer risks from air pollution well above levels EPA deems acceptable.

150.  EPA and the Plaintiffs raised concerns about how the Project's operation would create environmental justice impacts on communities in Newark.

151.  However, the Final EA does not identify Newark as an area where the Project may cause adverse impacts, let alone determine if the Project might result in disproportionately high and adverse impacts on populations of color and low-income populations in that community. For example, the Final EA did not consider the existing human health and environmental hazards in Newark; did not analyze how Newark, as an environmental justice community, would be affected by air pollution from increased truck trips and related port operations; and did not identify mitigation measures to address the unique health risks experienced by that community.

### *The Final EA fails to analyze whether the Project's construction and operation will create significant cumulative impacts in Staten Island*

152.  Staten Island, as discussed above, suffers from existing environmental health burdens from hazardous contaminants and air pollution.

153.  EPA and the Plaintiffs raised these concerns to the Coast Guard during the NEPA process.

154.  The Coast Guard did not consider how the Project's construction and operation would affect Staten Island, when viewed in light of all past, present, and future actions.

155.  For example, despite acknowledging that property in Staten Island has a history of being used for industrial operations, that hazardous contaminants are suspected to be present

where construction of the Project will occur, and that children in Staten Island have high levels of lead in their blood due to past exposure to lead, the Final EA fails to consider how past, present, or future actions have exposed or may expose Staten Island residents to hazardous contaminants and what cumulative impact such exposure may have on that community's health.

156.  The Final EA also fails to consider the cumulative air pollution impact on Staten Island during the operational period of the Project.

157.  Instead, the Final EA impermissibly concludes that because the Project's operations will not have any significant direct effects, then it will have no significant cumulative effect.

### The Final EA fails to analyze whether the Project's operations will create significant cumulative air pollution impacts in Newark

158.  The Final EA concludes that the Project will result in an additional 74,000 TEUs arriving at terminals west of the Bridge in 2035.  The Final EA goes on to conclude that the increase in truck and rail traffic associated with the movement of these additional TEUs is insignificant.

159.  The Final EA then impermissibly concludes that since the Project's operations will not have any significant direct effects, then it will have no significant cumulative effects.  As a result, the Coast Guard failed to consider whether the direct air pollution effects of the Project, even if insignificant as an individual action, could result in cumulatively significant air quality impacts in Newark when considered with other past, present, and future actions.

160.  Plaintiffs raised these concerns to the Coast Guard during the NEPA process.

161.  As a result of these and additional deficiencies in the Final EA, the Coast Guard failed to adequately assess the direct, indirect, and cumulative adverse effects of the Project on the environment and public health.  These deficiencies contributed to the Coast Guard's improper decision to not prepare an EIS.

## FIRST CLAIM FOR RELIEF

(Failure to Prepare an Adequate EA in Violation of the APA and NEPA)

162.  Plaintiffs hereby re-allege and incorporate by reference the allegations contained in paragraph 1 through 161 herein.

163.  The Coast Guard's issuance of the Permit Amendment constitutes a major federal action significantly affecting the quality of the human environment.

164.  To the extent that the Coast Guard is uncertain as to whether the Project's direct, indirect, or cumulative effects significantly affects the human environment, NEPA's implementing regulations permit the Coast Guard to prepare an EA to determine whether an EIS is necessary.  An EA must provide sufficient evidence and analysis for determining whether the Coast Guard should issue a FONSI or prepare an EIS.

165.  As set forth in the preceding paragraphs, the Coast Guard failed to prepare an adequate EA by failing to analyze all of the potentially significant adverse environmental effects of the Project, including the Project's impacts on induced growth, air quality, hazardous contaminants, environmental justice, and cumulative impacts.

166.  By granting the Permit Amendment to the Port Authority without performing the analyses required in an EA to determine the potential significant adverse environmental effects of the Project, the Coast Guard violated the APA, 5 U.S.C. §§ 701 *et seq.*, by acting arbitrarily and capriciously and in violation of federal law by failing to comply with the requirements of NEPA, 42 U.S.C. §§ 4321 *et seq.*, and NEPA implementing regulations, 40 C.F.R. §§ 1500.1 *et seq.*

167.  Unless the Coast Guard prepares an adequate EA that considers all potential significant impacts to human health and the environment, Plaintiffs and the region will suffer irreparable harm.

168.  Plaintiffs have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

(Failure to Provide Meaningful Public Participation by Relying on Non-Public Information in Violation of the APA and NEPA)

169.  Plaintiffs hereby re-allege and incorporate by reference the allegations contained in paragraph 1 through 168 herein.

170.  The Coast Guard's issuance of the Permit Amendment constitutes a major federal action significantly affecting the quality of the human environment.

171.  As set forth in the preceding paragraphs, the Coast Guard's Final EA, FONSI, and decision to forgo preparation of an EIS and to issue the Permit Amendment to the Port Authority was based on information that was not made available for public review and comment.

172.  By relying on non-public information and refusing to make such information available for public review and comment before issuing the Permit Amendment, the Coast Guard violated the APA, 5 U.S.C. §§ 701 *et seq.*, by acting arbitrarily and capriciously and in violation of federal law by failing to comply with the requirements of NEPA, 42 U.S.C. §§ 4321 *et seq.*, and NEPA implementing regulations, 40 C.F.R. §§ 1500.1 *et seq.*

## THIRD CLAIM FOR RELIEF

(Failure to Prepare an EIS in Violation of the APA and NEPA)

173.  Plaintiffs hereby re-allege and incorporate by reference the allegations contained in paragraph 1 through 172 herein.

174. The Coast Guard's issuance of the Permit Amendment constitutes a major federal action significantly affecting the quality of the human environment.

175. As set forth in the preceding paragraphs, the Permit Amendment will enable the Port Authority to raise the Bayonne Bridge and enable larger vessels to enter the Port.  This Project and its direct, indirect, and cumulative construction and operational effects will significantly affect the human environment in communities surrounding the Port.  Accordingly, issuance of the Permit Amendment is a major federal action for which a full EIS must be prepared.

176. By granting the Port Authority the Permit Amendment without preparing an EIS, engaging in the public process accompanying preparation of an EIS, and performing analyses as required in an EIS to determine the potential significant adverse environmental effects of the Project, the Coast Guard violated the APA, 5 U.S.C. §§ 701 *et seq.*, by acting arbitrarily and capriciously and in violation of federal law by failing to comply with the requirements of NEPA, 42 U.S.C. §§ 4321 *et seq.*, and NEPA implementing regulations, 40 C.F.R. §§ 1500.1 *et seq.*

177. Unless the Coast Guard prepares a full EIS that considers all potential significant impacts to human health and the environment, identifies mitigation measures to address such impacts, and evaluates a reasonable range of alternatives, Plaintiffs and the region will suffer irreparable harm.

178. Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment:

1. Declaring that the Coast Guard's FONSI violates NEPA and is therefore invalid;

2. Declaring that the direct, indirect, and cumulative effects of the Project may include significant environmental impacts, and require an EIS in order to comply with NEPA;

3. Declaring that the Coast Guard's failure to prepare an EIS violates NEPA and the APA;

4. Declaring that the Coast Guard's Final EA failed to analyze all potential significant adverse environmental effects of the Project;

5. Declaring that the Coast Guard's Final EA violates NEPA and the APA;

6. Ordering the Coast Guard to prepare an EIS;

7. Staying the effect of the Permit Amendment unless and until the Coast Guard complies fully with the requirements of NEPA and the APA;

8. Enjoining the Port Authority from taking any action in furtherance of the rights and authority afforded to it by the Coast Guard under the Permit Amendment;

9. Awarding Plaintiffs their costs and reasonable attorney fees incurred in prosecuting this action; and

10. Ordering such other relief as the Court may deem just and proper.

Dated: New York, New York
      July 31, 2013

Respectfully submitted,

*Nancy S Marks*

Nancy S. Marks

Nancy S. Marks (NM 3348)
Natural Resources Defense Council, Inc.
40 West 20th Street
New York, NY 10011
212/727-2700

    Attorney for Plaintiffs Coalition for Healthy Ports,
    Amy Goldsmith, North Shore Waterfront Conservancy
    of Staten Island, Inc., the Elm Park Civic Association, Inc.,
    and the Natural Resources Defense Council, Inc.

Aaron Kleinbaum (AK0608)
Eastern Environmental Law Center
744 Broad Street, Ste 1525
Newark, NJ 07102
973/424-1166

    Attorney for Plaintiffs Coalition for Healthy Ports,
    Amy Goldsmith, North Shore Waterfront Conservancy
    of Staten Island, Inc., and the Elm Park Civic Association, Inc.