UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 11/24/2015

COALITION FOR HEALTHY PORTS, *et al.*,

     Plaintiffs,

    v.

THE UNITED STATES COAST GUARD, *et al.*,

     Defendants.

No. 13-CV-5347 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

This case concerns the adequacy of the United States Coast Guard's environmental review of a project proposed by the Port Authority of New York and New Jersey to raise the height of the Bayonne Bridge so that larger ships can more readily access the Port of New York and New Jersey (the "Project"). In assessing the Project's environmental impacts, the Coast Guard opted to prepare an environmental assessment ("EA"), rather than a more detailed environmental impact statement ("EIS"). On the basis of this EA, it concluded that Project impacts would be insignificant, and issued a so-called finding of no significant impact ("FONSI").

Plaintiffs Coalition for Healthy Ports, Amy Goldsmith, North Shore Waterfront Conservancy of Staten Island, Inc., The Elm Park Civic Association, Inc., and the Natural Resources Defense Council, Inc. (collectively, "Plaintiffs") appeal from this decision, and contend that the Coast Guard violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*, by failing to take a "hard look" at the Project's induced growth, construction, environmental justice, and cumulative effects, and by insufficiently engaging the public in its induced growth analysis. Before the Court are the parties' cross-motions for summary judgment.

For the reasons that follow, Defendants' motions are granted in their entirety, and Plaintiffs' motion is denied.

## BACKGROUND

### I.    Statutory Framework

NEPA requires that "all agencies of the Federal Government" prepare an environmental impact statement, or EIS, upon proposing any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "[An EIS is a] detailed statement describing the environmental impact of the proposed action." *Pogliani v. U.S. Army Corps of Eng'rs*, 306 F.3d 1235, 1237 (2d Cir. 2002); *see generally* 40 C.F.R. § 1502 (setting out procedural and substantive requirements of such statements).

If it is unclear whether a proposed action will have a "significant" effect on the environment, an agency may first conduct an EA. *See* 40 C.F.R. §§ 1501.3–1501.4. An EA is a "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement." 40 C.F.R. § 1508.9(a). An EA "examines the environmental aspects of the project in less detailed terms than an EIS," *Pogliani*, 306 F.3d at 1237, and an agency preparing an EA is required to "involve environmental agencies, applicants, and the public" only "to the extent practicable," 40 C.F.R. § 1501.4(b).

An agency conducting an environmental review—whether an EIS or an EA—must consider and disclose a project's "direct" and "indirect" effects. 40 C.F.R. § 1508.8. "Direct effects" are those that "are caused by the action and occur at the same time and place," 40 C.F.R. § 1508.8(a), and include, among other things, construction-related impacts. "Indirect effects," meanwhile, are those that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Indirect effects include

2

"growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id.*

NEPA also requires reviewing agencies to consider the "cumulative impacts" of a project. 40 C.F.R. § 1508.7. A "cumulative impact" is the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* Cumulative impacts can thus "result from individually minor but collectively significant actions taking place over a period of time." *Id.*

Finally, as is relevant here, reviewing agencies must also consider a project's environmental justice impacts, an obligation imposed upon federal agencies by executive order *See* Exec. Order No. 12898, 59 Fed. Reg. 7630 (Feb. 11, 1994) (the "Executive Order"). A presidential memorandum accompanying the Executive Order, as well as subsequent guidance issued by the Council on Environmental Quality ("CEQ"), have clarified the Executive Order's scope in the context of NEPA: "Each Federal agency shall analyze the environmental effects, including human health, economic and social effects, of Federal actions, including effects on minority communities and low-income communities, when such analysis is required by the [NEPA]." Presidential Memorandum, *Executive Order on Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, 1 Pub. Papers 241, 242 (Feb. 11, 2014); *see also* CEQ, *Environmental Justice Guidance Under the National Environmental Policy Act* (1997) [hereinafter "*Environmental Justice Guidance*"].

If, on the basis of all the impacts considered and disclosed in an EA, an agency determines that an action will not significantly affect the environment, it must prepare a FONSI. *See* 40 C.F.R.

§ 1501.4. A project can proceed only if the agency has either issued a FONSI, or fully disclosed the anticipated significant impacts of a project in a more detailed EIS. Here, the Coast Guard determined that it need not prepare an EIS, and instead prepared an EA and issued a FONSI.

## II.    Factual Overview[1]

The Bayonne Bridge (the "Bridge") spans the Kill Van Kull, a tidal strait that runs between Staten Island, New York and Bayonne, New Jersey. *See* AR 4802, 4880. The Kill Van Kull is the primary shipping channel between New York Harbor and the Howland Hook and Port Newark-Elizabeth Marine Terminals, west of the Bridge. *See id.* at 4802, 4880. There is no alternate shipping route. *Id.* at 4804. Together with the Brooklyn and Port Elizabeth Terminals east of the Bridge, these four terminals comprise the Port of New York and New Jersey (the "Port")—the largest port on the Eastern Seaboard, and the third-busiest port in the United States. *See id.*

Cargo arriving at the Port is shipped—by truck or by rail—to a vast swath of the eastern United States, an area divided into a "primary hinterland" and a "secondary hinterland."[2] *See id.* at 5181–84. The Port's primary hinterland is the inland area within a 260-mile radius of its terminals, while its secondary hinterland includes the inland area between 260 and 400 miles from its terminals. *See id.*[3] In order to access these inland areas, trucks transporting cargo from the Port's

---

[1] A more detailed account of the Project's procedural and factual background is provided below in the Court's discussion of the parties' legal arguments.

[2] In this context, "hinterland" refers to the inland area served by a Port, or the "area from which its customers are drawn." AR 5171. In other words, it is the area to which cargo arriving by ship at a port is delivered, whether by rail or truck. *See id.*

[3] The Port's primary hinterland is distinguished from its secondary hinterland by the so-called "shipper indifference line," which is defined as "the line at which the shipper is indifferent to whether its goods are shipped through one port or another because shipping costs . . . are the same." AR 5182. As is discussed in more detail below, the primary hinterland—the geographical area within the "shipper indifference line"—is thus the portion of the Port's hinterland where demand is inelastic.

terminals west of the Bridge must pass through Newark, New Jersey, *see* AR 5189, which Plaintiffs characterize as an environmental justice community, *see* Pls. Br. 9.[4]

The existing Bridge restricts access by so-called post-Panamax ships to the Port's terminals west of the Bridge. AR 4808. Post-Panamax ships are a larger class of cargo vessel—approximately 1.5 times the size of existing cargo ships—the shipping industry is expected to adopt on a widespread basis following the completion of the Panama Canal widening project later this year. *See id.* at 4802, 4805. Whereas the Bridge's existing air draft—the vertical clearance of its roadway over the Kill Van Kull—is 151 feet, *id.* at 4802, the height of post-Panamax ships is 190 feet, *id.* at 4805.

A 2009 study conducted by the U.S. Army Corps of Engineers ("USACE"), the Bayonne Bridge Air Draft Study ("BBADA"), *id.* at 17252–320, estimated that elimination of the Bridge's air draft restriction would produce economic benefits of "a magnitude that would justify the cost of doing so." *Id.* at 17291. It found that elimination of the restriction would enable "fewer but larger vessels . . . to carry the same amount of commerce" as would otherwise be carried by a larger number of smaller vessels, *id.* at 17287–88, thus enabling the realization of "transportation cost savings to the nation that are attributable to the economies of scale that may be captured using larger vessels," *id.* at 17291. The total economic benefit of eliminating this restriction, USACE found, could exceed $3 billion. *Id.* at 17288.[5]

In 2011, the Port Authority applied to the Coast Guard for an amendment to the Bridge's original construction permit, so that it could undertake the Project to raise the roadway of the

---

[4] As defined by Plaintiffs, environmental justice communities are "low-income communities and communities of color . . . disproportionately affected by environmental degradation, such as polluted air, water, and/or soil." Pls. Br. 6 n.10.

[5] Importantly, however, in calculating these benefits, the BBADA did not "include increases in market share that might result from taking cargo from another facility, which may be a future scenario for the Port as a result of the current widening and deepening of the Panama Canal." AR 17291.

Bridge and eliminate its existing air draft restriction. *See generally id.* at 2–332.[6] The purpose of the Project, as characterized in the Port Authority's permit application, is to "raise the navigational clearance of the Bayonne Bridge to adapt the [sic] current trend in the shipping industry and allow for the port facilities west of the Bayonne Bridge to accept larger Post-Panamax vessels." *Id.* at 6. In addition, the Project will "bring the bridge into conformance with modern highway and structural design standards." *Id.*

In October of 2011, the Coast Guard made public its NEPA Work Plan, which provided an overview of the Project, its purpose, potential alternatives, and the topics the Coast Guard expected to consider as part of its environmental review. *See id.* at 31378–402. The Work Plan also defined the Project's so-called "study area" as consisting exclusively of northern Staten Island and Bayonne; it did not mention Newark, and Newark is not within the Project's study area. *Id.* at 31396. The Coast Guard convened an interagency meeting regarding the Work Plan on October 11, 2011, and solicited public comments until December 9, 2011. *See id.* at 4821. In February of 2012, it released a twenty eight–page document responding to the comments it received on the Work Plan, including comments from the Environmental Protection Agency (EPA) and the Federal Highway Administration (FHWA). *See id.* at 18552–79.

In June of 2012, the Coast Guard circulated a preliminary draft EA to several federal agency stakeholders, including EPA, USACE, and FHWA. *See id.* at 29397; *see generally id.* at 29398–431. To address concerns from EPA and FHWA regarding the Project's potential to induce cargo growth at the Port and its potential impacts on environmental justice communities, the Coast Guard also convened a technical meeting between the Port Authority and these federal agency stakeholders in late July of 2012. *See id.* at 43751–60. In October of 2012, this working group was

---

[6] Because the Project involves a bridge spanning navigable waters of the United States, the Coast Guard is the lead federal agency.

formalized as a Senior Advisory Group and as a Technical Working Group, both of which appear to have met weekly until early 2013 in an effort to identify and resolve any remaining disagreements among the Project's federal agency stakeholders before the Coast Guard issued its draft EA. *See, e.g., id.* at 36456 (e-mail from Coast Guard to members of Senior Advisory Group); *id.* at 43872 (e-mail from Coast Guard to members of Technical Working Group).

On January 4, 2013, the Coast Guard released its draft EA for public review and comment. *See id.* at 5347–11270. The draft EA considered, among other topics, the indirect, growth-inducing effects of the Project, its likely construction impacts, its cumulative impacts, and whether the Project would disproportionately or adversely burden environmental justice communities. *See id.* The Coast Guard took comments on its draft at a series of public meetings in Bayonne and Staten Island; the public was also afforded sixty days in which to submit written comments. *See id.* at 11271–74 (Federal Register notice describing public meetings and public comment period); *id.* at 18119–551 (transcripts of six public meeting sessions in Staten Island, Bayonne, and Newark). In total, the Coast Guard received approximately 235 written and oral comments on its draft EA, including those from the federal agency stakeholders comprising the Project's Senior Advisory Group. *See id.* at 36376–78.

On May 16, 2013, the Coast Guard published its final EA in the Federal Register. *See id.* at 4763–5345. The EA is nearly 600 pages in length, *see id.*, and includes more than 4,000 pages of appendices, *see id.* at 340–5345. It responds to every comment received on the draft EA, and, in some instances, reflects revisions or additions on the basis of these comments. *See generally id.* at 5200–324. In the final EA, the Coast Guard concluded that the Project would not have a significant environmental impact and issued a FONSI contemporaneously with the final EA. *See*

*id.* at 5346. On May 23, 2013, the Coast Guard granted the Port Authority's application for an amended permit. AR 333–39.

The Court heard oral argument in this case on October 7, 2015, at which time the Project was approximately 50% complete. Tr. 3:18–25.

## STANDARD OF REVIEW

NEPA is "a procedural statute that mandates a process rather than a particular result." *Stewart Park & Reserve Coal., Inc. (SPARC) v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003). It requires that an agency "withhold its decision to proceed with an action until it has taken a 'hard look' at the environmental consequences." *Id.*; *see Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438, 453–54 (S.D.N.Y. 2010). An agency takes a "hard look" when it has "adequately considered and disclosed the environmental impact of its actions." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 98 (1983).

NEPA, however, "does not itself provide for judicial review." *Brodsky v. U.S. Nuclear Regulatory Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013). Instead, review of an agency's decision not to issue an EIS is controlled by the "arbitrary and capricious" standard of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 375–76 (1989); *Natural Res. Def. Council, Inc. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 2d 198, 220–21 (S.D.N.Y. 2006). Specifically, the reviewing court must first consider whether the agency took the "hard look" that NEPA requires, and, if the agency did, then the court "must ask whether the agency's decision was arbitrary or capricious." *See Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).

In conducting this review, the district court is "relegated to affirming the agency's decision so long as a rational basis is presented for the decision reached." *Sierra Club v. U.S. Army Corps*

*of Eng'rs*, 772 F.2d 1043, 1050 (2d Cir. 1985). "To make this [arbitrary and capricious] finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). In particular, the "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Importantly, the reviewing court is "not empowered to substitute its judgment for that of the agency," *Citizens to Pres. Overton Park*, 401 U.S. at 416, and an agency decision will not normally be found arbitrary and capricious unless "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *State Farm Mut. Auto Ins. Co.*, 463 U.S. at 43.

Summary judgment is proper only where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, because the Court's review is limited to the administrative record, there are no disputes as to material facts; rather, the cross-motions turn only on questions of law.[7]

**DISCUSSION**

The parties do not dispute that the Coast Guard is subject to NEPA. Nor do Plaintiffs challenge the Coast Guard's decision to prepare an EA. They instead challenge the Coast Guard's

[7] Both the Port Authority and Plaintiffs submitted extra-record evidence regarding the Port Authority's contention that post-review Project developments moot Plaintiffs' claim that the Coast Guard failed to take a "hard look" at temporary construction impacts. Because the Court concludes that the Coast Guard did take a "hard look" at these impacts, however, it need not consider the Port Authority's mootness argument or any extra-record evidence. For this same reason, it also need not consider Plaintiffs' motion to strike this extra-record evidence.

conclusion, on the basis of this EA, that the potential environmental impacts of the Project were not sufficiently significant to require preparation of an EIS. Plaintiffs argue that this determination was arbitrary and capricious because the Coast Guard: (1) failed to take the requisite "hard look" at the induced growth effects of the Project; (2) violated NEPA's public participation requirements by relying on a nonpublic induced growth model; (3) failed to take a "hard look" at the potential public exposure to hazardous contaminants during Project construction, as well as any related environmental justice impacts; and (4) failed to take a "hard look" at whether Project construction would result in significant cumulative impacts in Staten Island. *See* Pls. Br. 48–50. Absent these procedural errors, Plaintiffs contend, the EA would have shown that the Project was likely to "create potentially significant impacts" such that an EIS was necessary. *Id.*

## I.    Induced Growth

As required by NEPA, the Coast Guard considered the induced growth effects of the Project. *See* 40 C.F.R. § 1508.8(b); AR 4526–45.[8] Specifically, the Coast Guard considered the extent to which the Project—by eliminating the existing air draft restriction—could impact shipping patterns and cargo volumes at the Port's terminals west of the Bridge. The Coast Guard concluded the Project would generate only a negligible increase in the volume of cargo diverted to the Port—a diversion that would not result in significant additional truck and rail traffic or otherwise result in a significant impact. *Id.* at 5187–88. This conclusion largely relied on an empirical analysis of the potential for cargo diversion performed by CH2M Hill, a consultant to the Port Authority. *See id.* at 5180–88. CH2M Hill's analysis relied, in turn, on a proprietary model,

---

[8] As used in this Opinion, "induced growth" refers to the Project's potential to increase the volume of cargo shipped to the Port beyond what would otherwise be anticipated in the Project's absence. This induced growth analysis is important because an increase in cargo results in an increase in the number of trucks carrying this cargo through Newark and other communities adjacent to the Port's terminals. An increase in trucks, meanwhile, results in more traffic, more noise, and increased levels of air pollution. It is this connection—between increased cargo and potential environmental impacts within Newark—with which Plaintiffs are principally concerned.

the Halcrow Model, which predicts how shipping companies will respond to changes in the cost of shipping to a specific port. Neither the Port Authority nor the Coast Guard had access to the Halcrow Model. *See id.* at 30526.

Because the Coast Guard did not independently verify or analyze the underlying model on which its own induced growth conclusions ultimately relied, Plaintiffs argue there is no evidence to support its conclusion that the Project would induce only minimal growth effects. Pls. Br. 18–20; Pls. Reply and Opp. 4–13. Plaintiffs further contend that there is substantial evidence in the record suggesting that the Port Authority "embarked on the Project for the sole purpose of increasing cargo through its terminals." Pls. Br. 15–16, 19, 20–26. Specifically, they rely on official statements made by the Port Authority prior to the Coast Guard's environmental review; comments by "ocean carriers, the largest retail associations in the country, labor unions, business associations, government agencies, and elected officials"; comments by other federal agencies critical of the Coast Guard's induced growth analysis; statements in the final EA itself; and a competing study by Plaintiffs' own consultant—all of which they contend undermines the reasonableness of the Coast Guard's conclusion that the Project would induce only minimal growth. *See id.* at 20–26. Indeed, Plaintiffs contend not only that the Project would induce growth, but that this growth would be sufficiently significant to require the inclusion of Newark within the Coast Guard's "study area" and preparation of an EIS. For the reasons that follow, the Court disagrees.

### A.    Procedural History

The circulation of the Coast Guard's preliminary draft EA in June of 2012 prompted significant disagreement between the Port Authority, EPA, and FHWA about the Project's potential to induce the growth of cargo volumes at terminals west of the Bridge. *See, e.g.*, AR

45525–26, 45535–36 (EPA comments expressing concern over "a basic impasse [that] still exists with regard to whether there is any relationship between the air draft of the Bayonne Bridge and the amount of cargo moving through [the Port]"); *id.* at 28488 (FHWA comment suggesting that Project-induced "growth in commerce locally and . . . growth destined for inland destinations be quantified"); *id.* at 28537 (Coast Guard letter to Port Authority noting that "quantifying port activity with and without the [Project] is the major challenge"). EPA and FHWA elaborated on these concerns at the late July 2012 technical meeting convened by the Coast Guard—a precursor to the Project's weekly Senior Advisory Group meetings—although their view that the Project could induce significant growth in cargo volumes was sharply disputed by USACE, which has substantial expertise in forecasting port growth. Specifically, USACE argued that the "raising of [the] bridge will not induce growth." *Id.* at 43752.

In response to these concerns, the Coast Guard convened another meeting of the same federal agency stakeholders on October 3, 2012, at which time it directed the Port Authority to identify a methodology for assessing the Project's induced growth effects. *See id.* at 29688–89. The Port Authority retained CH2M Hill for this purpose, and in mid-October circulated a proposed methodology to the Senior Advisory Group members for comments. *See id.* at 30050–53. The Port Authority then submitted the first full draft of CH2M Hill's induced growth study, which concluded that any induced growth effects would be minimal, to the Senior Advisory Group in November. AR 30200, 30202–222. EPA and FHWA again expressed methodological concerns, *see id.* at 30499, 43953–58 (EPA); *id.* at 11464–65 (FHWA), although the record does not show that any other Senior Advisory Group members expressed similar concerns.

On November 30, 2012, after "extensive consultation with [its] federal partners," the Coast Guard opted to prepare an EA, instead of an EIS. *Id.* at 30631. On January 4, 2013, the Coast

Guard released a draft of its EA to the public for review and comment. *See generally id.* at 5347–11270. In Chapter 18 of the draft EA, the Coast Guard discussed the findings of the CH2M Hill study, included as an appendix to the draft EA, *see id.* at 11130–50, its methodology, and induced growth considerations generally. It also described the methodology underlying the so-called Halcrow Model, on which CH2M Hill relied for its study, and concluded, on the basis of this study, that the Project would induce less than 1.0% of the total cargo volume anticipated at the Port in 2035—the equivalent of only 54 additional truck trips per day. *See id.* at 5729; *see generally* 2710-33. Although the Coast Guard recognized that additional truck traffic could impact Newark, the Coast Guard ultimately found that "[t]his small number of additional truck and rail trips would not affect the local or regional traffic network, noise levels, or air quality." *Id.* at 5729.

The Coast Guard received numerous comments—including several from Plaintiffs—regarding the draft EA's induced growth analysis, many of which expressed skepticism as to the validity of the Coast Guard's ultimate conclusion that the Project's induced growth effects would be minimal. *See id.* at 5289–310 (summarizing comments). In addition, Plaintiffs submitted a study conducted by their own expert consultant, Sustainable Systems Research (SSR), which concluded, based on data from an earlier Port Authority study, that the Project could result in a significant, 34% increase in cargo volume Port-wide by 2035—the equivalent of 2,340 additional truck trips per day. *See id.* at 16737–90.

Several federal agency stakeholders also submitted comments to the Coast Guard. EPA, for instance, submitted lengthy comments, but did not renew its methodological concerns or otherwise question the validity of CH2M Hill's analysis. *See id.* at 36430–31. Instead, it acknowledged the "inherent uncertainty in forecasting future trends in cargo movement and distribution," and recommended that the Coast Guard require the Port Authority to monitor Port

activity and commit in advance to mitigating any such impacts, "so that if the project does have an impact, action can be taken." *Id.* at 36430. The CEQ, meanwhile, noted that Department of Transportation ("DOT") "economists find the assumptions made in the paper to be reasonable and support the methodology employed by [the Port Authority and CH2M Hill] in their analysis." *Id.* at 30527. CH2M Hill responded at length to the comments of both agencies. *See generally id.* at 30521–30.

In response to continued public and agency debate as to the validity of its induced growth conclusion, the Coast Guard retained Cambridge Systematics ("Cambridge"), an independent consultant, to "confirm the reasonableness and appropriateness" of CH2M Hill's analysis. *Id.* at 5291. Cambridge also peer reviewed the competing induced growth study conducted by Plaintiffs' expert, SSR. *See generally id.* at 4571–84.

On May 16, 2013, the Coast Guard issued its final EA and FONSI. *See id.* at 340–5346. The Coast Guard did not alter its conclusion that the Project's induced growth effects would be minimal. *See id.* at 5167–5193. The final EA did, however, include Cambridge's peer reviews of the CH2M Hill and SSR studies as appendices, *see id.* at 4546–84, along with CH2M Hill's study, *see id.* at 4525-45. In response to EPA's comments, moreover, the Port Authority entered into a Memorandum of Understanding ("MOU") with the New Jersey Department of Environmental Protection ("NJDEP"), pursuant to which it agreed to a series of ongoing and future monitoring and mitigation measures—particularly as to potential impacts on air quality and traffic in the communities immediately adjacent to the Port Authority's terminals in New Jersey. *See id.* at 4585–96.

**B.     The CH2M Hill Study and its Peer Review by Cambridge Systematics**

CH2M Hill's study is quite technical; its methodology is complex and its conclusions rest on several assumptions regarding Port operations. As both CH2M Hill and the Coast Guard acknowledge, moreover, forecasting induced growth is inherently difficult and uncertain, as it requires multi-year projections of highly unpredictable trends in shipping patterns, inland demand, and competition among ports globally. *Id.* at 5181 (Coast Guard); *id.* at 4527–28 (CH2M Hill). That said, CH2M Hill's charge was narrow: determining the percentage of total cargo volume anticipated at the Port in 2035 that could be attributed to the Project (or, that would not otherwise occur in the absence of the Project). The CH2M Hill study thus tested the validity of Plaintiffs' contention that, by enabling post-Panamax ships to call at the Port's otherwise inaccessible terminals west of the Bridge, the Project would induce significant growth. *See* Pls. Br. 10–11.[9]

CH2M Hill's analysis relied on three key assumptions, each of which Cambridge later verified and found to be reasonable. *See* AR 4553–64 (Cambridge Systematics peer review of CH2M Hill assumptions).[10]   First, it assumed that demand within the Port's primary hinterland—which accounts for 80% of its cargo—is "essentially inelastic," meaning that the Project would not affect the volume of cargo destined for this area. *Id.* at 4529. In other words, even with the Bridge's air draft restriction still in place, shipping companies would continue to meet the demands of the primary hinterland by calling at the Port; they would just do so with a larger number of smaller ships. This inelasticity is largely a consequence of economic and geographic inefficiencies associated with competitor ports, including those accessible to post-Panamax ships; even without

---

[9] The two Port Authority terminals east of the Bridge are not, by dint of their geography, impacted by the Bridge's current air draft restrictions, and their ability to accommodate post-Panamax ships will not be impacted by the Project. AR 5176–77.

[10] Although the induced demand report produced by Plaintiffs' consultant, SSR, challenged some of these assumptions, any such challenges are not now before the Court. Rather, Plaintiffs' instant challenge is an exclusively procedural one and addresses only whether it was proper, as a matter of law, for the Coast Guard to have adopted its induced growth conclusion without reviewing the Halcrow Model or the underlying data on which this Model turned.

15

the cost savings associated with the Project, it would still be cheaper to call at the Port than to send cargo to other, nearby ports and ship it overland to the New York City region. Only within the secondary hinterland—to which only 20% of total Port cargo is directed—did CH2M Hill consider demand to be elastic, such that cargo volumes might change in response to a decrease in shipping costs. *Id.* at 4529. Said another way, the study was based on an assumption that any changes in future cargo volumes would result exclusively from demand in the secondary hinterland.[11]

Second, CH2M Hill assumed that even within this secondary hinterland, 80% of cargo originating at the Port would be shipped by rail, with only 20% shipped by truck. *See id.* at 4542. In other words, only 20% of the already relatively small portion of Port cargo destined for the secondary hinterland would result in the air quality and traffic impacts with which NEPA is concerned. Finally, CH2M Hill assumed that 80% of total cargo received at the Port would be attributable to terminals west of the Bayonne Bridge. *See id.* at 4539. The remaining 20% of cargo received at the Port, meanwhile, would continue to be received at the Port Authority's two terminals east of the Bridge. *See id.* The ability of those terminals to receive post-Panamax ships, it assumed, will not be impacted by the Project. *See id.*

In practical terms, these assumptions narrowed the scope of CH2M Hill's analysis: Any future increase in cargo volumes is assumed likely to result only from demand in the secondary hinterland—and only from that portion of such demand served by the Port's terminals west of the Bridge. Moreover, only a fraction of this already small share of cargo will be transported by truck;

---

[11] CH2M Hill's assumption as to the relative elasticity of the Port's primary and secondary hinterlands was drawn from the BBADA—the comprehensive study of the Bridge's air draft restriction performed by USACE in 2009. *See generally* AR 17252–17320.

the remainder will travel by train and is thus not relevant to the Coast Guard's environmental review.[12]

In determining the precise relationship between demand in the secondary hinterland and the potential for future cargo diversion to the Port from competitors elsewhere, CH2M Hill relied on the Halcrow Model. The Halcrow Model examines how incremental changes in ocean freight rates, port-related charges, intermodal rail rates, and trucking rates—which together comprise "total landed cost"—affect cargo volumes at the Port and four of its competitors.[13] *See generally id.* at 4536-37 (CH2M Hill explanation of its methodology); *id.* at 5184-87 (Coast Guard explanation of CH2M Hill's methodology).

To predict the relationship between changes in cost and changes in demand, the Halcrow Model uses elasticity data—data based largely on proprietary information about how shipping companies respond to changes in price and demand at ports globally. *See id.* at 5185.[14] Here, this data was used to calculate the impact on demand of incremental decreases—ranging from 0% to 25%—in the four components of total landed cost. *See id.* at 5186.[15] Specifically, the Model assumed that only the Port—and not its competitors—would experience decreases in these four cost components, an assumption that Cambridge considered unlikely and conservative in its peer review, *see id.* at 4566, as other ports are likely to match any decrease in rates at the Port in order

---

[12] On the basis of these assumptions alone, the Coast Guard's conclusion that the expected induced growth effects of the Project would be minimal is not unreasonable.

[13] Total landed cost is the total cost of a shipped product. AR 5186. The Model included competitor ports in order to estimate how price decreases at one port might result in the diversion of cargo from others. *Id.* Put simply, the Model assumed that any increase in cargo at the Port would, at least in part, be the result of shipping companies diverting cargo from elsewhere in order to take advantage of the Port's cheaper costs.

[14] In this context, "elasticity" is the measure of how demand responds to changes in cost.

[15] CH2M Hill employed relative cost differences instead of actual cost estimates in order to facilitate meaningful (*i.e.* "apple to apple") comparisons between ocean freight rates that vary significantly in absolute terms. AR 30524–25.

to remain competitive. *See id.* at 4539. As a consequence, CH2M Hill's calculations likely overstate Project-induced growth. *See id.* at 4541.[16]

The Halcrow Model thus turns on three key variables: future cargo volumes, changes in total landed costs anticipated as a consequence of the Project, and the elasticities associated with these changes in total landed costs. Of these three variables, all but the elasticities were disclosed to the public. Future cargo volumes were disclosed in CH2M Hill's study, *id.* at 4531, discussed extensively by the Coast Guard in its EA, *id.* at 5177–80, and compiled from publicly available data developed as part of USACE's BBADA, *id.* at 4531. The anticipated percentage decreases in total landed costs employed by CH2M Hill as part of its model were also disclosed. *id.* at 4537. Cambridge Systematics, moreover, reviewed the data underlying these two variables, and found CH2M Hill's treatment of both reasonable. *id.* at 4553-54, 64-67.

The Coast Guard, however, did not have access to the elasticity data used in the Halcrow Model or the underlying datasets from which these elasticities were derived—some of which are public, and some of which are proprietary and were developed for CH2M Hill's private sector clients. *See id.* at 30525–26; *see also id.* at 5304. Nor did the Coast Guard—or Cambridge—have access to the Halcrow Model itself. *See id.* at 30526. Nonetheless, both the final EA and the CH2M Hill study include a comprehensive overview of the Halcrow Model's methodology. *See id.* at 5184–87 (Coast Guard EA); *id.* at 4536–40 (CH2M Hill). The Coast Guard also provided a generalized description of the price elasticity data used by Halcrow in its responses to public

---

[16] Thus, for example, Halcrow could input a 5% decrease in the cost of ocean freight rates at the Port into its Model, and generate an estimate of how these decreased rates might impact inland demand, and how shipping companies might respond to these changes—for instance, by diverting cargo volume away from other, more expensive ports. *See* AR 4537. The Model allows Halcrow to run these sorts of simulations over and over, adjusting multiple variables at multiple ports each time, in order to develop a comprehensive measure of how likely specific changes in cargo volumes are to result from any corresponding change in port competitiveness. *See id.* In more technical terms, the Halcrow Model uses a "gravity model of trade"—a relatively common economic model that, in this case, allows Halcrow to estimate the complex relationship between a port's competitiveness and hinterland demand. *See id.* at 5304.

comments, included as Chapter 20 of the final EA. *See id.* at 5291–92. Furthermore, although Cambridge "could not evaluate the validity and reliability of the Halcrow Model, [it] believe[d] it to be based on a sufficiently large data sample over a long enough period of time to produce reasonably accurate estimates of the price elasticities of demand." *Id.* at 4566–67. Overall, Cambridge concluded that the Model's "induced demand estimates appear reasonable." *Id.* at 4567.

### C.    The Coast Guard's "Hard Look" at Induced Growth

Plaintiffs contend that the "fact that the Coast Guard never reviewed the Halcrow model or verified how the price elasticities were derived renders the agency's no growth position arbitrary and capricious." Pls. Reply and Opp. 5. The Court cannot agree.

Importantly, the Coast Guard did not adopt a "no growth position." It instead found that any growth in cargo volumes induced by the Project would be minimal, and that the environmental impacts of the increased truck traffic associated with this induced growth would be insignificant. The record before the Court, moreover, shows that this conclusion was well within the realm of reasonableness and adopted only after the Coast Guard took a sufficiently "hard look" at Project-induced growth.

As an initial matter, courts typically reject induced growth analyses as procedurally deficient only where the record reveals a complete absence of any such analysis. *See, e.g., Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1136–37 (9th Cir. 2011) ("The agencies cannot point to any document[] in the record that actually discusses the impact of a third runway on aviation demand."); *Sierra Club v. Marsh*, 769 F.2d 868, 881 (1st Cir. 1985) (finding federal agencies' review of project's induced growth effects procedurally insufficient where these agencies "ignore[d] these impacts" altogether). This is plainly not the case here. Whatever the merits of

Plaintiffs' argument, they cannot plausibly contend that there is no record in favor of the Coast Guard's growth conclusions.

The question Plaintiffs raise is nevertheless a valid one: whether it was reasonable for the Coast Guard to rely on the record before it without having reviewed all of the data underlying CH2M Hill's induced growth calculations. Plaintiffs' principal argument in this respect is that the record cannot plausibly "reveal a rational connection," *Brodsky*, 704 F.3d at 119, between the Coast Guard's conclusion that Project-induced growth would not require an EIS and the facts underlying that conclusion—facts that the Coast Guard itself never independently evaluated. Pls. Br. 19–20; Pls. Reply and Opp. 5–7.[17]

In some respects, Plaintiffs' contentions have merit. It is true, for instance, that the Coast Guard did not independently review the Halcrow Model or the datasets from which the elasticities used in this model were derived. It is also true, as Plaintiffs argue, that the accuracy of the Coast Guard's induced growth analysis is important: "If the EA underestimated how much cargo will be induced by the Project, it will have understated every environmental impact that accompanies an increase in trade at the Port, including the number of polluting cargo-carrying trucks that will traverse nearby communities, including environmental justice communities in Newark." Pls. Reply and Opp. 3; *see also* AR 4564 ("If the change in price is too large or too small, or the economic model of how shippers respond to changes in price is wrong, then the estimates of

---

[17] Plaintiffs also contend that NEPA's implementing regulations required the Coast Guard to "independently evaluate the information submitted and . . . be responsible for its accuracy." 40 C.F.R. § 1506.5(a); Pls. Reply and Opp. 5. In the context of an EA, however, this regulation applies only if "an agency permits an applicant to prepare an environmental assessment." 40 C.F.R. § 1506.5(b). Where an applicant is permitted to prepare its own EA, this sort of policing by the federal agency makes sense: It guards against self-interest, and ensures that applicants do not systematically understate the significance of a project's environmental impacts. Here, however, where the Coast Guard—not the Port Authority—prepared the EA, the regulation does not apply. It is true that the Port Authority—not the Coast Guard—retained CH2M Hill, AR 30202, but this is not sufficient to trigger the obligation of "independent evaluation." Even if it were, moreover, the Court finds that the Coast Guard's review of CH2M Hill's methodology—and its decision to have this methodology peer reviewed—satisfies this obligation, even without the Coast Guard itself able to review the Halcrow Model or its underlying elasticity data.

induced cargo demand . . . would not be accurate."). Put simply, if the EA significantly understated the Project's induced growth impacts, the Coast Guard should have expanded the Project's "study area" to include Newark and prepared an EIS.

Even so, the record does not demonstrate that the Coast Guard's reliance on CH2M Hill's induced growth calculations was unreasonable. First, at the time the Coast Guard issued its FONSI, CH2M Hill had responded to the methodological concerns raised by EPA in response to the NEPA Work Plan and preliminary draft EA. *See id.* at 30521–30. EPA's comments on the draft EA did not raise further methodological concerns, although they expressed a continuing concern that induced growth might be more significant than stated. *See id.* at 36430. Instead, its comments principally emphasized protective measures that could be taken in light of the uncertainty inherent in forecasting induced growth. *See id.*[18] Second, USACE, which completed its own comprehensive study of demand at the Port in 2009 and arguably has technical expertise in demand forecasting, agreed from the outset that the Project would not induce growth. *Id.* at 43751–60. Third, comments submitted by the CEQ indicated that DOT economists found "the assumptions made in the [CH2M Hill] paper to be reasonable and support[ed] the methodology employed by [the Port Authority] in their analysis." *Id.* at 30527. Finally, although Cambridge Systematics "could not evaluate the validity and reliability of the Halcrow Model, [it did] believe it to be based on a sufficiently large data sample over a long enough period of time to produce reasonably accurate estimates of the

---

[18] Even if EPA had continued to challenge CH2M Hill's methodology, this inter-agency disagreement would not be dispositive. It was sufficient for the Coast Guard to consider and respond to EPA's comments. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 201 (D.C. Cir. 1991) ("The EPA participated here. But the FAA, not the EPA, bore the ultimate statutory responsibility for actually preparing the environmental impact statement, and under the rule of reason, a lead agency does not have to follow the EPA's comments slavishly—it just has to take them seriously.").

price elasticities of demand" and found that CH2M Hill's "induced demand estimates appear reasonable." *Id.* at 4566–67.

CH2M Hill, moreover, in responding to EPA and CEQ comments on the draft EA, offered considerable assurances as to the quality and accuracy of its proprietary data:

> The cost estimates embedded in the Halcrow model are independent values derived by Halcrow from their databases of numerous other studies, specifically undertaken on behalf of private investors in terminals worldwide, as well as in the United States. Given these investors' requirements for accuracy in due diligence, we are assured that the values used by Halcrow are a more robust/accurate representation, than those presented by the USACE, of actual costs. Since these costs are derived from efforts that are bound by client confidentiality, Halcrow is unable to disclose the actual numbers publicly; however, we can confirm that they are consistent with the numbers presented by the USACE.

*Id.* at 30525.  In addition to receiving these assurances, the Coast Guard reviewed the induced growth methodology proposed by the Port Authority before authorizing CH2M Hill's study, as did EPA, FHWA, and USACE. *See id.* at 30200. The Coast Guard issued its draft EA only after giving these agencies an opportunity to respond and comment. *See id.*; *see also id.* at 30631. In its final EA, the Coast Guard also discussed the induced growth methodology used by CH2M Hill— including its use of the Halcrow Model—and in response to public comments, it described the methodology used by Halcrow to derive the price elasticities on which the Model relied. *See id.* at 5291–92.[19] It is thus clear that the Coast Guard understood and considered the methodology used by CH2M Hill, even if it could not otherwise assess the Model itself. It is also clear that it considered the validity of any undisclosed data on which the Model relied.

---

[19] The conservativeness of this methodology—namely, the assumption that only the Port and not its competitors would experience decreases in total landed costs—further supports the Coast Guard's decision to rely on CH2M Hill's study.

At the time it issued its FONSI, the Coast Guard had also reviewed the induced growth study conducted by Plaintiffs' consultant, SSR—a study that contradicted the findings of CH2M Hill. *See id.* at 16737–90. In addition, it had considered Cambridge's peer review of the SSR study, which rejected SSR's conclusions and questioned the reliability of the data on which these conclusions rested. *See id.* at 4571–84. That the Coast Guard reviewed and considered, but found methodologically unsound, a study contradicting its own induced growth conclusions further supports its decision to rely on CH2M Hill's study. The Coast Guard's discretion to reject the conclusions of SSR's study, moreover, is well supported in the law. *See Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). Indeed, this would be so even if Cambridge had determined that SSR's study was methodologically sound. *See id.*

To the extent Plaintiffs challenge the sufficiency of this record, they parse the procedural requirements of NEPA far too narrowly and ignore the important procedural distinctions between an EA and an EIS. Although it is true, at least in the case of environmental impact statements, that "the administrative record must disclose the studies and data used," *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 368 (D.C. Cir. 1981), the Coast Guard has done just that here: it disclosed CH2M Hill's induced growth findings, included CH2M Hill's study as an appendix to both the draft and final EA, and discussed CH2M Hill's methodology at length. It also considered and received assurances as to the integrity of CH2M Hill's methodology and the validity of any underlying data. The Court cannot read NEPA to require more—particularly in the context of an EA. *Cf.* 40 C.F.R. § 1508.9(b) ("[An EA must] include *brief* discussions of the . . . environmental impacts of the proposed action." (emphasis added)).

The record thus demonstrates that even without having reviewed the Halcrow Model or its underlying price elasticity data, the Coast Guard's induced growth analysis complied with the procedural requirements of NEPA. The Coast Guard has done all that NEPA requires: it retained a qualified expert to conduct an induced demand study; it reviewed the methodology employed by this expert; it received assurances as to the quality of the data underlying its consultant's methodology; it considered and responded to comments regarding this methodology; and it determined, on the full record before it, that its consultant's study provided a reasonable estimate of the induced demand effects of this Project. The Coast Guard "adequately considered and disclosed" the Project's induced growth impacts, *Balt. Gas & Elec. Co.*, 462 U.S. at 98—and its conclusion that these impacts would be insignificant was not impermissibly arbitrary or capricious.

### D. Contrary Evidence in the Record

Plaintiffs nonetheless contend that even if the Coast Guard's induced growth conclusions and its reliance on CH2M Hill's study has support in the record, the record also "contains compelling evidence that contradicts the agency's growth estimates," Pls. Br. 19, 20–26, namely, official statements made by the Port Authority prior to the Coast Guard's environmental review; comments by "ocean carriers, the largest retail associations in the country, labor unions, business associations, government agencies, and elected officials"; comments by other federal agencies critical of the Coast Guard's induced growth analysis; and statements in the final EA itself, *id.* at 20–24. Plaintiffs contend that these statements, all of which purportedly suggest that the purpose of the Project is to induce growth, should cause the Court to view the Coast Guard's induced growth conclusion with skepticism. *Id.* The record evidence Plaintiffs marshal in support of this premise is unconvincing, however, and is, indeed, largely consistent with the Coast Guard's reasoned conclusion that the Project would not induce significant growth.

Plaintiffs' argument largely rests on the faulty premise that the "Port Authority embarked on the Project for the sole purposes of increasing cargo through its terminals," and that "[t]here is no other logical justification for the $1.3 billion project." *Id.* at 19. Specifically, Plaintiffs assert that the Port Authority itself touted the growth-inducing benefits of the Project prior to the Coast Guard's environmental review, and purportedly claimed, in an array of official statements, that "the Bridge must be raised to increase business at the Port and to prevent cargo from being diverted to other ports that can accommodate post-Panamax vessels." *Id.* at 20. In support of this argument, they cite the following: two statements in the EA, a statement from a 2005 Port Strategic Plan, USACE's 2009 BBADA, statements made by the Port Authority in a 2010 grant application to DOT, similar statements made in a 2012 request to DOT and the Department of Homeland Security ("DHS") to list the Project as having "national and regional significance," the Port Authority's 2012 permit application to the Coast Guard, and Port Authority statements made to the press—all of which purportedly evince the Project's growth-inducing purpose. *Id* at 20–23.

Few of these statements are inconsistent with the stated purpose of the Project, however, which is to "preserve the economic efficiency and sustainability of the Port . . . and bring the bridge into conformance with modern highway and structural design standards." AR 4801. In contending otherwise, Plaintiffs mistake efficiency for growth. As CH2M Hill determined, shipping companies will continue to meet demand in the Port's primary hinterland however they can, whether or not the Project is built. *See id.* at 4529 ("[C]argo destined for the primary hinterland is seen as captive to the PONYNJ and its demand is essentially inelastic."). The only question is whether they will do so with larger, post-Panamax ships, which are more economically and environmentally efficient than existing fleets, or with a larger number of smaller, less efficient ships. It is these economic and environmental benefits—and not growth—that the Port Authority

25

touts in the many statements regarding the Project's purpose it made prior to the Coast Guard's environmental review.

Of the two purportedly inconsistent statements that Plaintiffs identify in the Project's EA, for instance, the first merely quotes a 1999 USACE study suggesting that "[a]ir draft is . . . a concern on the Kill Van Kull due to the 151-foot vertical clearance at the Bayonne Bridge, but it is not yet a limiting factor," *id.* at 4807, while the second notes that "the absence of the [P]roject . . . would continue to pose a risk to the ability of the Port to efficiently and economically meet anticipated future cargo demand," *id.* at 5178. Neither statement stands for the proposition that the purpose of the Project is necessarily growth; instead, both identify the air draft restriction as an impediment to the economic benefits associated with access to the Port by post-Panamax vessels.

Similarly, although the 2005 Port Strategic Plan references "increase[d] market share," this reference is made in the context of a series of infrastructure investments, such as "dredging at 50 feet and increasing clearance under the Bayonne Bridge," not removal of the air draft restriction alone. *Id.* at 17067. In any event, the Port Strategic Plan goes on to note that "[b]y permitting much larger vessels . . . these investments will help keep the cost of shipping per container competitive," *id.*, a benefit that is consistent with the Port Authority's efficiency rationale for the Project.

The BBADA, the 2009 study conducted by USACE, is not to the contrary. *See id.* at 17252–17320; Coast Guard. Br. and Opp. 8-10. It concluded that removing the Bridge's air draft restrictions would "require fewer but larger vessels . . . to carry the same amount of commerce as is carried in the without-project conditions," AR 17288, and that "economies of scale . . . may be captured" as a result, *id.* at 17291.[20] The Port Authority's permit application similarly states that

---

[20] At oral argument, Plaintiffs argued that there could be no justification for the Project's $1.3 billion cost other than growth. The BBADA belies this argument. It suggests that the elimination of the Bridge's air draft restrictions could result in a very significant benefit to the regional and national economy—potentially as much as $3.2 billion—which would result from economic efficiencies associated with larger ships, not growth. Specifically, it

the "constraint of the vertical clearance of the existing Bayonne Bridge will prevent [post-Panamax] vessels from having access to major marine terminals . . . and ultimately will impair the economic growth and vitality of not only the region but of the country." *Id.* at 6. Both sets of statements, along with others identified by Plaintiffs, speak to the Project's efficiency rationale—the idea that the elimination of the Bridge's air draft restriction will allow the region to take advantage of cost efficiencies and economies of scale associated with larger vessels—and not to Project-related growth.

Only two of the statements identified by Plaintiffs plausibly support their contention that the Port Authority touted the Project as growth-inducing. Neither are dispositive. The Port Authority's 2010 grant application to DOT, for instance, states that the "existing Bayonne air draft restriction may damage the economies of New York and New Jersey as shipping companies will be encouraged to divert to ports capable of handling larger economically efficient vessels." *Id.* at 15988. But this statement is consistent with the Coast Guard's finding that the Project would induce some growth, however insignificant. It was also made prior to CH2M Hill's completion of its induced growth study, as was the Port Authority's 2012 request to DOT and the DHS. *See id.* at 24850 ("Raising the bridge roadway is crucial to maintaining the Port's position as the third largest port in the country."). In any event, these isolated statements do not suggest agency "doublespeak," *Sierra Club*, 772 F.2d at 1053, and give the Court no reason ignore—or even to view with skepticism—the significant record in support of the Coast Guard's position that the Project will induce only minimal growth.

Nor is the Coast Guard's position belied by the many statements of ocean carriers and shipping companies suggesting that they will divert cargo elsewhere if the Bridge's air draft

---

found that removal of the air draft restriction would likely enable shipping companies to save considerable amounts of money, savings that would eventually inure to consumers within the Port's hinterland. *See* AR17287–88

restriction is not eliminated. *See* Pls. Br. 22–23 (summarizing comments) (quoting AR 11385, 12786–87, 12790–92, 20348–49, 20360–62, 20365–66, 32151–52). If, without the Project, shipping companies would divert cargo elsewhere, then with the Project, so the argument goes, they would not; it is this difference in cargo volumes with and without the Project that Plaintiffs contend is sufficiently significant to require an EIS. This argument is ultimately without merit. Although they may disagree with the outcome, Plaintiffs do not challenge the procedural basis for the Coast Guard's finding that demand in the Port's primary hinterland, which accounts for 80% of Port-wide cargo, is inelastic. There is thus significant, uncontested empirical evidence that at least for this sizable segment of demand at the Port, shipping companies are unlikely to divert cargo elsewhere, no matter their statements to the contrary. Diverting cargo elsewhere, the Coast Guard properly found, would only cost these carriers more. *See* AR 5182.

Plaintiffs' remaining argument, that the "text of the EA contradicts itself on the induced growth issue," Pls. Br. 23, is also without merit. The statements identified by Plaintiffs do not conflict with the Coast Guard's conclusion that the Project's induced growth effects will be minimal. They are instead consistent with the economic efficiency justification offered for the Project and reflect a concern that, without the Project, the region would not benefit from these efficiencies. *See id.* at 4808 ("The air draft restriction of the Bayonne Bridge now poses a clear restriction on the ability of large ships to call the Port and remains an impediment to the long-term economic efficiency and sustainability of the Port."); *id.* at 4802 ("Maintaining the existing air draft limitation could put the region served by the Port . . . at an economic disadvantage."); *id.* at 4801–02 (same); *id.* at 4810, 5178,5198 (same).

Taken in its entirety, the record does not undermine—and is, indeed, consistent with—the Coast Guard's conclusion, on the basis of CH2M Hill's induced growth study, that Project-related induced growth would be minimal.

### E.    Conclusion

For the foregoing reasons, the record supports the conclusion that the Coast Guard took a "hard look" at the Project's induced growth effects and that the Coast Guard's determination that Project-related growth will be minimal demonstrates "a rational connection between the facts found and the choice" to forgo the preparation of an EIS. *State Farm Mut. Auto Ins. Co.*, 463 U.S. at 43 (quotations omitted).

## II.    Public Participation

Plaintiffs further argue that even assuming that the Coast Guard took a sufficiently "hard look" at induced growth, the unavailability of the Halcrow Model and its underlying price elasticity data violated NEPA's public participation requirements. Pls. Br. 28–30. The record establishes otherwise.

An agency preparing an EA is required to "involve environmental agencies, applicants, and the public" only "to the extent practicable," 40 C.F.R. § 1501.4(b), and agencies are afforded "considerable discretion to decide the extent to which such public involvement is practicable," *Brodsky*, 704 F.3d at 121. "When the exercise of that discretion is challenged on appeal, the reviewing court properly considers whether the lack of public input prevented the agency from weighing all the factors essential to exercising its judgment [under NEPA] in a reasonable manner." *Id.* (quotation omitted). *Brodsky* thus suggests that NEPA's public participation and "hard look" requirements are closely linked; the absence of public participation is actionable only to the extent it precludes an agency from taking a "hard look."

Courts in this Circuit have found public participation in the preparation of an EA insufficient only where an agency has failed to "notify or solicit feedback from the public *at all*." *Id.* (remanding to the reviewing agency where it failed to involve the public entirely) (emphasis in original). In *Town of Rye, N.Y. v. Skinner*, for instance, the Second Circuit rejected petitioners' contention that the Federal Aviation Administration ("FAA") failed to sufficiently involve the public in its preparation of an EA. *See* 907 F.2d 23, 24 (2d Cir. 1990). After noting that the "FAA and Westchester County conducted public hearings and received written comments on every draft environmental assessment; the FAA circulated for comment its Preliminary Analysis of the environmental assessment; and the FAA's independent analysis itself was done in response to comments of petitioners," the court held that "NEPA requires no more." *Id.* This focus on public participation generally—and not with regard to individual components of an EA—is consistent with the rule adopted by the Ninth Circuit in environmental review cases: "An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of the circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008).

This is not a case where, viewed in the "totality of the circumstances," the reviewing agency entirely failed to involve the public. The Coast Guard gave public notice of its NEPA Work Plan, solicited public comments on this Work Plan, and responded to each of the comments it received in a separate public document. The Coast Guard also circulated a draft EA publicly, took public comments on this draft for a period of sixty days, held six public meetings at which it solicited additional comments, and established a website to provide regular Project updates to the public. In its final EA, moreover, the Coast Guard responded at length to each of the comments

30

received. Plaintiffs availed themselves of these opportunities for public comment—including on the issue of induced growth. As discussed above, they submitted a comprehensive study of induced growth performed by their own expert consultant, which the Coast Guard then commissioned a separate expert consultant to peer review, and this peer review was itself made public and included as an appendix to the Project's final EA. Thus, taking into account the "totality of the circumstances," the Coast Guard satisfied NEPA's public participation requirements for when an agency elects to perform an EA.

In support of its position that NEPA's public participation requirement demands more of reviewing agencies, Plaintiffs cite to several cases holding that the "underlying environmental data relied upon to support . . . expert conclusions must be made available to the public." *Sierra Nevada Forest Prot. Campaign v. Weingardt*, 376 F. Supp. 2d 984, 991 (E.D. Cal. 2005) (citing *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 996 (9th Cir. 2004)); *see also Natural Res. Def. Council, Inc. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 2d 198, 218 (S.D.N.Y. 2006); Pls. Br. 29. As an initial matter, this rule, which originates in the Ninth Circuit, is now uncertain in light of the more recent "totality of the circumstances" rule announced in *Bering Strait Citizens*. *See* 524 F.3d at 953. In any event, a close reading of the cases applying this rule suggests that it is not as supportive of Plaintiffs' position as they contend.

Rather, these cases support Defendants' position that the scope of public participation in the Coast Guard's induced growth analysis satisfied NEPA. Specifically, the cases suggest that agency conclusions as to the significance of environmental impacts "are inadequate if they contain only narratives of expert opinions" and do not otherwise provide the empirical basis for these conclusions. *See Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 996. In other words, the "expert conclusions" that must be supported by the underlying data on which they rely are those of the

31

federal agency itself, *Weingardt*, 376 F. Supp. 2d at 991, not those of expert consultants like CH2M Hill, retained by a federal agency as part of the environmental review process, *see Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 996. What the Coast Guard needed to—and did—disclose was CH2M Hill's induced growth findings, not the model on which CH2M Hill, an expert consultant retained by the Coast Guard, itself relied.

In *Klamath-Siskiyou*, for instance, which concerned the sufficiency of a cumulative effects analysis conducted by the Bureau of Land Management, "the only mention of cumulative effects in the two EAs [came] in the form of generalized conclusory statements that the effects are not significant or will be effectively mitigated." 387 F.3d at 996. The Bureau's analysis, moreover, was entirely narrative. *Id.* The Bureau sought to assure the court "that to the eye of the 'agency specialists,' the scant information included in the EAs [was] sufficient to determine what the cumulative environmental impacts [would] be and support[ed] the conclusory statements that they [would] not be significant." *Id.* The Ninth Circuit, however, rejected these assurances, and concluded that the EAs did not satisfy NEPA's public participation requirement: "Even accepting the BLM's representation that 'specialists' can understand the information in these EAs, the documents are unacceptable if they are indecipherable to the public." *Id.* It is only in this context—finding inadequate the assurances of a reviewing agency regarding its own conclusory analysis of environmental impacts in an EA—that the Ninth Circuit announced the rule on which Plaintiffs attempt to rely. *Id.* ("NEPA documents are inadequate if they contain only narratives of expert opinions.").[21]

---

[21] The other principal case to which Plaintiffs cite is no different. *See* Pls. Br. 29 n.24 (citing *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir.1998) ("[A]llowing the Forest Service to rely on expert opinion without hard data either vitiates a plaintiff's ability to challenge an agency action or results in the courts second guessing an agency's scientific conclusions. As both of these results are unacceptable, we conclude that NEPA requires that the public receive the underlying environmental data from which a Forest Service expert derived her opinion."), *overruled on other grounds*, *Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc)).

Properly understood, this rule is inapposite here. First, the scope and detail of the Coast Guard's induced growth analysis far exceeds that of the Bureau's cumulative effects analysis in *Klamath-Siskiyou*. Second, although the Coast Guard described CH2M Hill's methodology in narrative fashion, its ultimate conclusion was based on a very specific—and public—quantitative finding: that the Project would induce only 0.7% of growth anticipated at Port terminals west of the Bridge in 2035. The Coast Guard, moreover, converted this percentage into the precise number of additional truck trips that could be expected as a consequence of such growth. It is only on the basis of these two quantitative figures—0.7% growth, the equivalent of 54 additional truck trips per day—that the Coast Guard arrived at its induced growth conclusion.

This is the "underlying environmental data" that NEPA requires. *Id.* (quoting *Idaho Sporting Cong.*, 137 F.3d at 1150). By quantifying and disclosing the actual degree of growth expected as a result of the Project, the Coast Guard enabled the public to, in effect, check its work. Indeed, this is precisely what Plaintiffs did when they submitted their own induced growth study, which showed higher levels of induced growth, and significantly more truck traffic. That the Coast Guard considered and disagreed with the conclusions of Plaintiffs' expert, choosing to rely on the findings of its own expert instead, was entirely proper and, if anything, suggests that the Coast Guard's analysis of induced growth was far from "indecipherable to the public." *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 996. Plaintiffs did not need the Halcrow Model, or its underlying price elasticity data, to challenge the Coast Guard's induced growth conclusions. They only needed the quantitative findings on which the Coast Guard's conclusion actually turned. The law does not require more.

Thus, regardless of whether the Court is analyzing the Coast Guard's compliance with NEPA's public participation requirement under the relatively more lenient "totality of the

circumstances" standard, or examining Plaintiffs' ability to participate meaningfully in the Coast

Guard's analysis of induced growth more specifically, the Coast Guard satisfied its obligations

under NEPA.

### III.    Construction Impacts

In its environmental review, the Coast Guard also considered the temporary impacts of

Project construction on the communities adjacent to the Bridge—impacts that a federal agency

must consider in analyzing a proposed action's "direct effects." *See* 40 C.F.R. § 1508.8(a); AR

5018–5028 (final EA analysis of long-term effects of hazardous and contaminated materials on

properties adjacent to the Bridge); AR 5057–5157 (final EA analysis of temporary construction

impacts). Plaintiffs challenge the sufficiency of the Coast Guard's analysis. Pls. Br. 30–44; Pls.

Reply and Opp. 31–44. They contend that the Coast Guard failed to ascertain and to take a "hard

look" at the potential health risks associated with the disturbance of contaminated soil during the

Project's construction. *Id.* The record, they argue, suggests that these health risks may be so

significant as to have required the preparation of an EIS. *Id.*[22] To the extent the Coast Guard's

FONSI relied on measures intended to mitigate such impacts, moreover, Plaintiffs contend that the

efficacy of these measures is without support in the record, and that the Coast Guard's reliance on

them was thus improper. *Id.*

Defendants contend otherwise. They argue that the Coast Guard thoroughly considered the

presence of hazardous materials and contaminants in the Project's zone of construction, disclosed

these contaminants as part of its environmental review, and "reasonably concluded that temporary

construction activities would not create a significant impact on the environment." *See, e.g.*, Coast

Guard Reply 9. They further contend that the Coast Guard's consideration of measures intended

---

[22] Importantly, Plaintiffs do not otherwise challenge the sufficiency of the Coast Guard's review of temporary construction impacts, including, for instance, the Project's potential effects on traffic, air quality, and noise levels.

to minimize any constructed-related impacts was procedurally proper. *See, e.g.*, Coast Guard Br. and Opp. 33–34; Port Authority Reply 26–29. In addition, the Port Authority—but not the Coast Guard—argues that assessment and monitoring measures implemented after the close of the record in this case render Plaintiffs' arguments moot. *See, e.g.*, Port Authority Reply 29–32.

For the reasons that follow, the Court finds that the Coast Guard took the "hard look" at temporary construction impacts that NEPA requires. It is thus unnecessary for the Court to consider the Port Authority's arguments regarding mootness.

### A.    The Record

The Coast Guard's NEPA Workplan, issued in September 2011, described the scope of the review it intended to conduct of the Project's temporary construction impacts. AR 31378–402. Specifically, the Workplan indicated that the Coast Guard would conduct a Phase I Environmental Site Assessment ("ESA") for the Project. An ESA characterizes the "past and current uses of a site as related to contaminated materials usage and potential for subsurface contamination." *Id.* at 5019–20. On the basis of an ESA, an agency can determine whether and to what extent further investigation of potential contamination is necessary, and can "identify protocols and measures to be undertaken during construction to avoid adverse effects on human health from project-related exposure to hazardous materials." *Id.* at 31400. In addition to conducting an ESA, the Coast Guard, in its Workplan, indicated that it would "summarize actions to be taken during project construction to limit exposure of construction workers to potential contaminants." *Id.* at 31401.[23]

Plaintiffs, in their comments on the NEPA Workplan, raised concerns about the Coast Guard's review of the Project's impacts on hazardous and contaminated materials, namely, that any such review would be "pro-forma" and that the ESA should include a "real-time assessment"

---

[23] At the time of the final EA, it was "anticipated that project construction would require a total of approximately 45 months to complete," beginning in June 2013 and ending in March 2017. AR 5060.

of potential contamination, and not just rely on historical records. *Id.* at 18569. The Coast Guard responded at length to this comment, noting that the ESA would rely on "field visits, [historical maps] . . . and recent database information from various regulatory agencies"—not just historical records. *Id.* In addition, the Coast Guard assured Plaintiffs that the ESA would be followed by "detailed subsurface investigations" of those sites where "evidence of past or current contamination exists and . . . the project will disturb this area during construction." *Id.*

The Coast Guard retained Hatch Mott MacDonald ("HMM"), a consultant, to prepare an ESA for the Project, and the draft EA included as appendices two HMM studies of hazardous and contaminated materials: an ESA of Project-adjacent sites owned by the Port Authority, *see id.* at 5775–8506, and a more limited Environmental Screening of Project-adjacent sites that the Port Authority did not own and to which HMM thus had less access, *see id.* at 8504–11119. The ESA encompassed the "17 Port Authority owned properties that comprise the Bayonne Bridge and its approaches located in Staten Island, New York and Bayonne, New Jersey," *id.* at 5780, while the Environmental Screening studied six Project-adjacent sites owned by entities other than the Port Authority, *id.* at 8527. For its ESA, HMM conducted "site reconnaissance" of each property, which included a "visual review of the interior and exterior portions of the project site and the interior of all accessible onsite structures; a review of standard historical sources . . . and a review of reasonably ascertainable standard Environmental Record Sources." *Id.* at 5781. For its Environmental Screening, meanwhile, HMM was limited to site reconnaissance and visual review of only the "exterior portions of the project site," but still conducted "a review of standard historical sources . . . and reasonably ascertainable standard Environmental Record Sources." *Id.* at 8509.

36

The ESA identified several "recognized environmental conditions" on the properties owned by the Port Authority, including historic fill, polychlorinated biphenyls (PCBs), lead, several soil stockpiles, one property that had previously been used as a rail spur, at least one underground storage tank potentially associated with a former filling station, and "surficial staining" and "dark colored soil" near, respectively, several drain outfalls (where runoff from the Bridge drains onto Port Authority properties) and a dumpster. *See id.* at 5797–800.[24] HMM opined that further "characterization" may be required for each of these environmental conditions "[s]hould planned construction activities include the disturbance of soil." *Id.* at 5799–800. HMM also found concentrations of arsenic in soil and groundwater on one site, but noted that "the Port Authority [had] prepared a Draft Remedial Action Workplan to address" these concentrations. *Id.* at 5798. HMM nonetheless opined that the Port Authority should submit a final Remedial Action Work Plan to the NJDEP—the relevant state regulator—prior to May 2012, the date by which a Licensed Site Remediation Professional would need to be retained in order for remediation to be completed in advance of construction. *See id.* at 5800. In addition, the ESA revealed the presence of a groundwater monitoring well, which HMM noted is a "concern," *id.* at 5798, and for which it recommended "[r]egulatory agencies . . . be contacted for additional information," *id.* at 5800. The Environmental Screening revealed analogous conditions on the sites owned by entities other than the Port Authority. *See id.* at 8523–25. HMM recommended that if planned construction would result in the disturbance of any soil, the Coast Guard should characterize these conditions. *See id.* at 8523–24.

In Chapter 14 of its draft EA, the Coast Guard summarized HMM's findings and opinions as part of its discussion of long-term Project effects. *See id.* at 5565–75. Chapter 16 of the draft

---

[24] HMM's report provided the specific concentrations of PCBs, lead, and arsenic found on those sites where each contaminant was discovered. *See* AR 5797–98.

EA, which addressed the temporary construction impacts with which Plaintiffs are concerned, incorporated this summary by reference. *See id.* at 5604–700. The Coast Guard concluded, however, that "[t]he presence of contaminated materials only presents a threat when exposure to these materials occurs. Even then, a health risk requires both a complete exposure pathway to the contaminants and a sufficient dose to produce adverse health effects." *Id.* at 5698.

"[T]o prevent such exposure pathways and doses," the draft EA noted, "the project would include appropriate health and safety and investigative/remedial measures (conducted in consultation with the appropriate regulatory authorities)." *Id.* The draft EA summarized these measures: it noted, for instance, that "[a]ppropriate engineering controls . . . to minimize asbestos exposure would be implemented prior to and throughout the project"; that "lead abatement work . . . would be performed" on relevant Bridge structures; and that any "[s]uspected PCB-containing equipment . . . that would require disturbance for construction of the project would be surveyed and evaluated" and then "removed and disposed of in accordance with applicable federal and state regulations." *Id.* at 5699. The draft EA also noted that a "Licensed Site Remediation Professional . . . will oversee the remediation" of the property on which HMM found elevated arsenic levels, and that the Port Authority would "perform additional subsurface testing at this site to guide health and safety procedures and measures." *Id.*

Importantly, the draft EA also indicated that "[p]rior to commencing site disturbance, a Construction Health and Safety Plan (CHASP) would be prepared [by the Port Authority] to address both the known contamination issues and contingency items (e.g., finding unexpected contamination or petroleum storage tanks)." *Id.* at 5700. The CHASP was to "describe in detail the health and safety procedures to minimize exposure of contaminated materials to workers and the public. The hazards would be evaluated by determining the known or suspected subsurface

38

contaminants of concern and their chemical and physical characteristics, and health hazards would be considered within the potential exposure associated with the work to be performed." *Id.* The CHASP would, moreover, be "developed in accordance with OSHA [or the Occupational Safety and Health Administration's] regulations and guidelines." *Id.*

Plaintiffs submitted extensive comments regarding the draft EA's consideration of temporary construction impacts, expressing concern, for instance, that "the [draft ]EA's analysis of the potential risk from hazardous contaminants is full of data gaps, and is below the standard of care for Phase I assessments and for what should have been done given the complexity of the Project and data available about the contaminants at or near the construction sites." *Id.* at 13066; *see also id.* at 12345–52. Plaintiffs also raised concerns about the "risks created when heavy construction activities occur next to the Richmond Terrace Radiological Site," a property adjacent to the Project site that warehoused high-grade uranium ore during World War II. Pls. Br. 14; *see also* Pls. Br. 35–36 (commenting on hazards associated with the Richmond Terrace Radiological Site); AR 5027.

On May 16, 2013, the Coast Guard released its final EA. *See* AR 340-5345. In Chapter 16, the Coast Guard elaborated on the proposed scope of the CHASP. *See id.* at 5153–57. It clarified that, as part of its CHASP, the Port Authority would conduct an analysis of the "health hazards" associated with any known or suspect contamination prior to Project construction, and provided additional detail as to the particular measures the Port Authority would employ in order to mitigate any health risks and ensure worker safety. *See id.* In Chapter 20, meanwhile, the Coast Guard responded at length to public comments regarding the temporary impacts of construction on hazardous and contaminated materials, *see id.* at 5281–85, and clarified that "[t]he project would

not result in any construction activities or disturbance on the Richmond Terrace Radiological Site," *id.* at 5282.

Ultimately, the Coast Guard concluded, as it had in its draft EA, that any health hazards associated with contaminated soil would arise only from direct exposure to disturbed soil, and that the Project included mitigation measures sufficient to prevent such exposure. In its May 13, 2013, FONSI, it stated that "[t]his action has been thoroughly reviewed by the Coast Guard and it has been determined . . . that this project will have no significant effect on the human environment." *Id.* at 5346.

### B.   The Coast Guard's "Hard Look" at Temporary Construction Impacts

Plaintiffs contend that the Coast Guard failed to take a "hard look" at the potential health impacts that could result from the disturbance of hazardous materials and contaminated soil during Project construction—and that the efficacy of the measures intended to mitigate these potential impacts are without proper support in the record. *See* Pls. Br. 44–48. The Court concludes otherwise.

Whether or not the Coast Guard took a "hard look" at temporary construction impacts turns, initially, on the context in which it considered the mitigation measures described in its final EA. In this respect, recent guidance issued by CEQ is instructive. *See* CEQ, *Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact*, 5 (Jan. 14, 2011) [hereinafter "*Mitigation Guidance*"].[25] As is relevant here, the *Mitigation Guidance* distinguishes between, on the one hand, mitigation measures an agency considers "as components of project design" and, on the other, those to which an agency

---

[25] The *CEQ Guidance* is, by its own terms, not legally enforceable, but it nevertheless provides agencies and courts with important insight into how CEQ, the office responsible for promulgating NEPA's implementing regulation, interprets NEPA's procedural requirements and what it considers procedurally sound.

"commit[s] . . . as necessary to support a mitigated FONSI." *Mitigation Guidance* 5. In other words, an agency may consider mitigation measures prior to determining the significance of a project's environmental impacts, as integral components of a project's design; alternatively, upon determining that project impacts will be significant, an agency may consider the potential for mitigation measures to minimize those impacts such that it can forgo preparing an EIS. *See id.* at 5–7; *see also Abenaki Nation of Mississquoi v. Hughes*, 805 F. Supp. 234, 243–45 (D. Vt. 1992), *aff'd*, 990 F.2d 729 (2d Cir. 1993) (distinguishing between measures "submitted by an applicant or agency as part of the original proposal" and those considered in mitigation of impacts that would otherwise require an EIS (internal citation omitted)).[26]

The distinction between these two approaches is in the level of evidentiary support necessary to justify a FONSI. Mitigation measures proposed as integral components of a project's design are scrutinized as part of an agency's overall "hard look" at project impacts. In other words, they receive a "hard look" along with every other component of a project. Accordingly, they need only be "clearly described as part of the proposed action." *Mitigation Guidance* 6. In these cases, the only task for a reviewing court is to ensure that the relevant agency did, in fact, take a sufficiently "hard look" at project impacts before issuing a finding of no significant impact. In the case of a "mitigated FONSI," however, the reviewing agency proposes mitigation measures only *after* taking a "hard look" at a project and determining that the project *will* have significant environmental impacts. Because mitigation measures, with respect to a mitigated FONSI, are not evaluated as part of an agency's "hard look" at project impacts, additional record support is necessary.

---

[26] That *Abenaki Nation* and the *CEQ Guidance* both endorse an agency's consideration of mitigation measures proposed as part of a project's design belies Plaintiffs' argument that such an approach—"act first, study later," as Plaintiffs characterize it, Pls. Br. 36—runs afoul of NEPA.

41

In effect, an agency must take a separate "hard look" at any measures to which it commits in support of a "mitigated FONSI." Specifically, these measures should not be adopted "if there are insufficient legal authorities, or it is not reasonable to foresee the availability of sufficient resources, to perform or ensure the performance of the mitigation." *Id.* at 7. As characterized in this circuit, the adequacy of such measures must be supported by "substantial evidence." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997) ("When the adequacy of proposed mitigation measures is supported by substantial evidence, the agency may use those measures as a mechanism to reduce environmental impacts below the level of significance that would require an EIS."); *see also Friends of Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1557 (2d Cir. 1992) ("Under these circumstances, and given that FERC's findings regarding the adequacy of mitigative measures are supported by substantial evidence, FERC has 'convincingly documented' its finding of no significant impact."); *Abenaki Nation of Mississquoi*, 805 F. Supp. at 245 ("As long as the adequacy of mitigation measures are clearly supported, *Ompompanoosuc* strongly suggests that the Second Circuit joins the majority of courts in finding it proper for an agency to consider mitigation plans in determining the significance of the environmental impact of an action.").

Plaintiffs argue that the Court should evaluate the Coast Guard's consideration of construction-related mitigation measures using the more rigorous "substantial evidence" rule. Pls. Reply and Opp. 40–44. In support of this argument, they contend that the Coast Guard issued what amounts to a "mitigated FONSI." *See id.* at 40. According to Plaintiffs, the Coast Guard's final EA all but acknowledges the significance of the Project's temporary construction impacts, and "the Coast Guard's FONSI is predicated on mitigation measures that will purportedly reduce construction impacts to less than significant levels." *Id.* Defendants contend otherwise. At oral argument, they repeatedly emphasized that the Coast Guard considered the challenged mitigation

measures as integral components of the Project's design and determined—after taking a "hard look" at the Project—that its temporary construction impacts would be insignificant. Tr. 29:16–31:21. The Coast Guard's FONSI, Defendants argue, was not a "mitigated FONSI," and is thus not subject to the "substantial evidence" rule. *Id.* The Court agrees.

Contrary to Plaintiffs' assertions, the Coast Guard did not issue a mitigated FONSI. It considered the mitigation measures described in the final EA as integral components of the Project's overall design, and it is thus not subject to the "substantial evidence" rule. The cases cited by Plaintiff are therefore inapposite; each concerns a "mitigated FONSI" issued after a preliminary determination that the environmental effects of a project would be significant—not the circumstances presented here. *See Hoffman*, 132 F.3d at 17 (rejecting as insufficient "Forest Service's attempt to moderate one of the anticipated impacts of its proposed logging project"); *Friends of Ompompanoosuc*, 968 F.2d at 1556–57 (upholding FONSI where agency "examined the Project's impact on the aesthetic, cultural, historical, and recreational aspects of the site; [] considered inconsistencies with state environmental plans; and . . . proposed measures to minimize certain unavoidable environmental impacts."); *Abenaki Nation of Missisquoi*, 805 F. Supp. at 243 ("The administrative record indicates that once the Corps reached the position that it was possible that the Project could be permitted under GP 38 if the authorization was conditioned upon an adequate mitigation plan for cultural and biological impacts, the Corps gave great consideration to whether or not the mitigation plan proposed by the Village was adequate.").

The Court's conclusion that the Coast Guard did not issue a mitigated FONSI is supported by the FONSI itself, which merely states the Coast Guard's finding that "this project will have no significant effect on the human environment," AR 5346, and does not, for instance, describe mitigation measures the Port Authority must undertake in order to eliminate or minimize impacts

that might otherwise require an EIS. This conclusion is also supported by the *Mitigation Guidance*, which provides as examples of mitigation measures constituting integral components of a project's design some of the very measures considered by the Coast Guard. *See Mitigation Guidance* 6 ("An example of mitigation measures that are typically included as part of the proposed action are agency standardized best management practices such as those developed to prevent storm water runoff or fugitive dust emissions at a construction site."); *c.f. Abenaki Nation of Mississquoi*, 805 F. Supp. at 239 n.9 (measures adopted in support of mitigated FONSI consisted of "twenty-three Special Conditions . . . attached to the . . . permit" and amounted to "an intensely detailed plan for achieving the mitigation goal of replacing lost wetland functions and values, and protecting cultural and historic resources threatened, as a result of the Project."). Finally, this conclusion is consistent with the Coast Guard's determination, in its final EA, that the "presence of contaminated materials only presents a threat when exposure to these materials occurs" and that "[i]n order to prevent such exposure pathways and doses, the project would include appropriate health and safety and investigative/remedial measures (conducted in consultation with the appropriate regulatory authorities)." AR 5154. In other words, the Project's design—to the extent it incorporates "appropriate" mitigation measures—ensures that any health impacts resulting from the disturbance of contaminated will be insignificant. *See id.*

The only question remaining for the Court is thus whether the Coast Guard took a sufficiently "hard look" at the Project's temporary construction impacts—and the mitigation measures included in the Project's design—before concluding that these impacts would be insignificant. The Court concludes that it did.

The Coast Guard commissioned HMM to conduct a comprehensive study of soil conditions on properties adjacent to the Bridge—including properties not owned by the Port Authority itself—

which revealed the presence of several hazardous environmental conditions. It is true, as Plaintiffs argue, that the ESA and Environmental Screening did not determine the precise extent or degree of contamination for every property and every condition. *See* Pls. Br. 16. But this was not necessary in light of the Coast Guard's conclusion that any health risks associated with the Project's construction would arise only from exposure to contaminated soil, together with its finding that the mitigation measures proposed by the Port Authority as part of the Project's design would prevent such exposure. The Coast Guard's conclusion is supported, in this respect, by the "rule of reason," a rule "inherent in NEPA and its implementing regulations . . . which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004). Applying this rule here, the Coast Guard's determination that the Project's design would adequately guard against exposure to contaminated soil obviated the need for further investigation—at least beyond that conducted as part of the Port Authority's CHASP.

In its final EA, the Coast Guard described clearly—albeit concisely—the mitigation measures included in the Project's design, and noted that many of these measures would be subject to the separate approvals and permitting processes of various state and local regulatory agencies. *See City of Alexandria v. Slater*, 198 F.3d 862, 870 (D.C. Cir. 1999) (finding agency's brief discussion of construction impacts in EIS sufficient where agency acknowledged "numerous regulatory constraints that will limit the extent of construction activities.").[27] Asbestos exposure is to be minimized through "[a]ppropriate engineering controls" and "governed by both federal and state requirements." AR 5154. Likewise, PCB-containing equipment will be "removed and

---

[27] In this respect, the Court is also persuaded by the conclusion of the New York City Department of Environmental Protection, a municipal agency with environmental expertise, that "[w]ith the measures described [in the EA] there would be no potential for the project to have significant adverse impacts due to hazardous materials." AR 20088.

disposed of in accordance with applicable federal and state regulations." *Id.* Similarly, arsenic is to be remediated by a Licensed Site Remediation Professional consistent with a Remedial Action Work Plan submitted to and overseen by the New Jersey Department of Environmental Protection. AR 5156. The CHASP—the most comprehensive mitigation measure included in the Project's design—meanwhile, is to be "developed in accordance with OSHA regulations and guidelines." *Id.* at 5155. And consistent with the suggested guidelines for mitigation measures outlined in the *Mitigation Guidance*, the CHASP includes measures for monitoring both the implementation and efficacy of proposed mitigation measures throughout the Project's construction. *See id.* at 5155–56; *Mitigation Guidance* 8–12.

The Court thus cannot conclude that the Coast Guard failed to take a "hard look" at temporary construction impacts. The Coast Guard rigorously considered the potential for contamination on sites adjacent to the Bridge, identified actual sources of contamination and hazardous materials on these sites, and determined that any health impacts from this contamination would result only from direct exposure, and that the mitigation measures included in the Project's design would minimize soil disruption and thus prevent such exposure. In short, it did all that NEPA requires, and its determination that the temporary impacts of construction will be insignificant is both reasonable and well-supported in the record.

## IV.    Cumulative Impacts

In its EA, the Coast Guard considered the Project's cumulative impacts—those which result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions," 40 C.F.R. § 1508.7—and concluded that the Project would have no cumulative effects on the environment, whether during construction or its long-term operation, AR 5193–5196.

46

Plaintiffs challenge this determination, and contend that the Coast Guard failed to take a sufficiently hard look at the Project's cumulative impacts. Pls. Br. 46–48; Pls. Reply and Opp. 44–53. In particular, Plaintiffs assert that the Coast Guard failed to examine the "incremental impact of the Project when added to *past* impacts," Pls. Br. 47, and that it should have conducted a health study to better understand the Project's potential cumulative health risks, Pls. Opp. and Reply 50–53. In response, Defendants contend that the Coast Guard's consideration of the Project's cumulative impacts was adequate, and that nothing in NEPA requires the Coast Guard to conduct the health study Plaintiffs seek. *See* Coast Guard Reply and Opp. 14–15; Coast Guard Br. and Opp. 36–37. For the reasons that follow, the Court agrees with the Coast Guard that it took a sufficiently "hard look" at the Project's cumulative impacts.

### A.    The Record

In Chapter 18 of its final EA, the Coast Guard concluded that the Project would not have any significant cumulative impacts, during either its operational or its construction phases.[28] As to the Project's operational phase, this conclusion rested on the Coast Guard's findings, elsewhere in its EA, that the Project would have no significant long-term effects, either direct or indirect. AR 5193. Specifically, it found that "since the project has been determined to have no direct or indirect effect on regional traffic capacity or vehicle miles traveled . . . , and no substantial effect on volume of Port activity or overall maritime trade patterns, it would have no cumulative effect in combination with other projects." *Id.* at 5310; *see also id.* at 5193. In other words, the Coast Guard's conclusion that the Project would not have long-term environmental effects obviated the need for a detailed analysis of past actions; with no long-term effects of its own, the Project

---

[28] The Coast Guard also addressed the Project's cumulative impacts both in its NEPA Workplan, AR 31402, and in its draft EA, *id.* at 5733–36. The final EA indicates that the Coast Guard received only two general comments regarding these early analyses, both of which it responded to at length. *Id.* at 5308–10.

logically could not combine with past actions to result in a significant impact. At least as to air quality, moreover, the Coast Guard determined that the Project "would result in a net *reduction* in marine emissions, improving air quality in the region." *Id.* at 4974 (emphasis added).

As to the Project's construction phase, the Coast Guard's "no impact" conclusion rested, at least in part, on analyses of past actions elsewhere in the EA. For instance, in Chapter 16 of the EA, which evaluates the Project's temporary construction impacts, the Coast Guard concluded that construction-related air impacts would not exceed federally regulated National Ambient Air Quality Standards ("NAAQS"), which are calibrated to safeguard human health. *See id.* at 5137 (summarizing air quality impacts). In the same chapter, the Coast Guard also determined that the Project would not result in any impacts from hazardous and contaminated materials. *See* Discussion *supra* Part III. Similarly, in Chapter 17 of the EA, devoted to environmental justice impacts, the Coast Guard concluded that the Project would not adversely impact those populations already suffering from elevated lead exposure, asthma, and other respiratory ailments as a consequence of past actions. *See id.* at 5164–66.

The Coast Guard's conclusion that construction of the Project would not result in any cumulative impacts also rested on an evaluation of planned future actions. Specifically, the Coast Guard considered fifteen projects—overseen by a variety of other agencies and expected to break ground in the years following the Coast Guard's environmental review—that could plausibly combine with the Project to produce significant cumulative impacts. *See id.* at 5194–96. Ultimately, however, the Coast Guard concluded that only one of these projects had the potential to result in cumulative impacts. As to the remaining projects, the Coast Guard concluded that one would be too small to result in cumulative impacts, that the construction of two others would not overlap with construction of the Project and thus could not produce cumulative impacts, seven

48

were residential and would be confined to the project sites, and that a final project was too early in its planning phase for the Coast Guard to adequately assess its potential to combine with the Project. *See id.* And although it expected that the construction of four other projects could overlap with construction of the Project, it concluded that no cumulative impacts would result from this overlap, largely as a consequence of these projects' distance from the Bridge and their minimal anticipated impacts on local traffic. *See id.* The only project expected to potentially result in cumulative impacts was the Port Authority's planned replacement of the Goethals Bridge, which links Staten Island to Elizabeth, New Jersey. *See id.* at 5195. In Chapter 16 of its EA, however, the Coast Guard analyzed the extent of these expected cumulative impacts—the combined impacts from construction of the Project and the replacement of the Goethals Bridge—and found that they would amount to an overall increase in traffic delays of only 2.06 minutes, an impact the Coast Guard considered insignificant. *See id.*

## B.   Discussion

Because significant impacts can result from "individually minor but collectively significant actions taking place over a period of time," NEPA requires agencies to consider cumulative impacts as part of the environmental review process. 40 C.F.R. §§ 1508.7, 1508.8(b); *see also Klamath-Siskiyou*, 387 F.3d at 994 ("Sometimes the total impact from a set of actions may be greater than the sum of the parts."). At least one circuit understands this requirement to mean that any discussion of cumulative impacts must include "some quantified or detailed information." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002). A federal agency, however, "does not act arbitrarily or capriciously by excluding from its [environmental review] those projects that cannot be meaningfully discussed at the time the agency issues its [review]." *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 527 (7th Cir. 2012); *but see Natural*

*Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 88 (2d Cir. 1975) ("The fact that another proposal has not yet been finally approved, adopted or funded does not foreclose it from consideration, since experience may demonstrate that its adoption and implementation is extremely likely.").

Here, the Coast Guard satisfied its obligation to take a "hard look" at the Project's cumulative impacts. Although concise, its discussion of cumulative impacts in Chapter 18 of the final EA adequately considered the potential of both past and future actions to combine with the Project and produce significant environmental impacts. The Coast Guard's analysis was sufficiently detailed and, where necessary, quantitative. At the very least, it satisfied the level of review required of an EA. *See* 40 C.F.R. § 1508.9(a) (defining an EA as a "*concise* public document . . . that serves to . . . *[b]riefly* provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement" (emphasis added)). The Coast Guard's evaluation of past actions, for instance, although presented as part of other chapters in the final EA and not solely in Chapter 18, involved detailed, empirical analyses of long-term and construction-related air impacts, induced growth effects, and the potential impacts from hazardous and contaminated materials on pre-existing health conditions prevalent in the communities adjacent to the Bridge. Its evaluation of future actions, similarly, offered particularized quantitative detail whenever cumulative impacts could plausibly result, namely in traffic delays associated with the overlap in construction of the Project and the Port Authority's replacement of Goethals Bridge. Otherwise, the final EA offers a detailed account of the Coast Guard's determination regarding cumulative impacts. This approach—offering detailed, quantitative information only when impacts are expected—is consistent with the "rule of reason" that governs an agency's discretion to conduct further analysis. *See Pub. Citizen*, 541 U.S. at 767. Moreover, the Court cannot find that the Coast Guard's determination that the expected 2.06 minute traffic delay would amount to

an insignificant impact was arbitrary or capricious. *See State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 42 (noting that the arbitrary and capricious standard requires only that an agency make determinations "based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute").

Taken in its entirety, the EA thus demonstrates that the Coast Guard took a sufficiently "hard look" at the potential cumulative impacts of the Project, as required by NEPA. Because the Coast Guard concluded that the Project would not result in significant cumulative impacts only after taking that "hard look," its decision not to conduct the detailed health study Plaintiffs now seek was appropriate. *See Izaak Walton*, 655 F.2d at 377 ("Where adverse environmental impacts are not likely, expensive and time-consuming studies are not necessary."). Plaintiffs, moreover, have not identified any cases, regulatory provisions, or even informal agency guidance suggesting that NEPA requires a health study in such circumstances. In sum, the Coast Guard took the "hard look" at cumulative impacts that NEPA requires, and its conclusion that the Project would not result in any such impacts—even without the benefit of the health study sought by Plaintiffs—was neither arbitrary nor capricious.

**V.    Environmental Justice Impacts**

Finally, as is required by the Executive Order on environmental justice, issued in 1994, the Coast Guard's EA considered the Project's potential environmental justice impacts. *See* AR 5158–66. On the basis of this analysis, the Coast Guard concluded that "minority and low-income populations would not bear a disproportionately high and adverse share of operational or construction impacts as a result of the project." *Id.* at 4796; *see also id.* at 5166.

Plaintiffs, by contrast, argue that the Coast Guard failed to take a "hard look" at the Project's environmental justice impacts, and that its conclusion that these impacts would be

51

insignificant was "arbitrary and capricious." *See* Pls. Br. 44–46; Pls. Opp. and Reply 54–57. For the reasons that follow, the Court finds that the Coast Guard took the "hard look" at environmental justice impacts that NEPA requires.

### A.    The Record

The NEPA Workplan, issued in September 2011, identified environmental justice impacts as one component of the Coast Guard's planned environmental review. *See* AR 31397. In its draft EA, the Coast Guard outlined its methodology for assessing these impacts. *See id.* at 5702. Consistent with DHS guidance implementing the Executive Order, this methodology included five steps: 1) identifying the Project's study area; 2) identifying low-income and minority populations within the study area; 3) identifying the Project's potential adverse impacts on these populations; 4) determining whether any such impacts would disproportionately burden these populations; and 5) identifying measures to avoid or reduce any disproportionate adverse impacts. *See id.*[29]

The draft EA rigorously followed this methodology. First, it identified the Project's study area as the communities in Staten Island and Bayonne located within a quarter mile of the Bridge. *See id.* Second, it determined that the study area includes thirteen so-called "census block groups" that consist predominantly of low-income or minority populations. *See id.*; *see also id.* at 5703–07 (detailed demographic overview of census block groups within Project's study area).[30] Third, because the Coast Guard found that the Project's long-term impacts—the potential for increased truck or train traffic—would be minimal, it ultimately concluded that the Project would not have any long-term adverse impacts on the low-income and minority populations within the study area.

---

[29] This methodology largely follows CEQ's guidelines on environmental justice, which implement the Executive Order. *Environmental Justice Guidance*, 10–16.

[30] "Census block groups" are the smallest geographic units for which the United States Census Bureau publishes demographic information. In its draft EA, the Coast Guard provided the detailed demographic information for the thirteen census block groups located within the Project's study area. AR 5704.

*See id.* at 5707. While the Coast Guard it did recognize that "some localized adverse effects would occur in the study area during the construction phase of the project," it nevertheless concluded that "these effects would be temporary and would end once construction is complete, and do not violate any" NAAQS. *Id.* Finally, the Coast Guard determined that because the Project would not result in any significant adverse impacts on the environment, and that low-income and minority populations within the study area would not be disproportionately burdened by any such impacts. *See id.* at 5707–08. As a consequence of this finding, the Coast Guard did not evaluate the need for additional mitigation measures aimed at environmental justice impacts specifically. *See id.* at 5709.

In its final EA, the Coast Guard elaborated on the scope of its analysis, but again concluded that low-income and minority populations within the Project's environmental justice study area would not be disproportionately burdened by significant adverse impacts. *See id.* at 5158–66.[31] It noted, for instance, that EPA has designated the North Shore of Staten Island an Environmental Justice Showcase Community, with which EPA is working to address an array of environmental justice issues, including a high incidence of children with elevated levels of lead. *See id.* at 5159. The Coast Guard further noted that any structures or soil contaminated within the Project's zone of construction would be removed, "thereby reducing the potential for exposure to lead in the long-term," and that the CHASP would address any potential short-term impacts associated with removal. *Id.* at 5165. In its final EA, the Coast Guard also discussed the potential for the Project to exacerbate respiratory illnesses within the study area. *See id.* It concluded, however, that because the Project would comply with national air quality standards, or NAAQS, designed to "protect

---

[31] The final EA's more detailed discussion of environmental justice impacts is likely in response to the comments the Coast Guard received on its draft EA. *See* AR 5285–89 (summarizing and responding to public comments); *see also id.* at 30812–14 (EPA comments on preliminary draft EA).

human health, including vulnerable populations," it "would not have adverse health effects on any environmental justice (or other) communities." *See id.* at 5166.

### B.    Discussion

Although the Executive Order expressly states that it does not create a private right to judicial review, *see* 59 Fed. Reg. 7632–33, Plaintiffs' environmental claim is nonetheless properly before the Court, as it arises under NEPA and the APA, not the Executive Order. *Accord Cmtys. Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004); *Senville v. Peters*, 327 F. Supp. 2d 335, 362 (D. Vt. 2004). The Court thus considers whether the Coast Guard took a sufficiently "hard look" at the Project's environmental justice impacts under the APA's deferential "arbitrary and capricious" standard.

Here, the Coast Guard did take a "hard look" at the Project's environmental justice impacts. Contrary to Plaintiffs' assertions that it did not follow its own methodology, Pls. Br. 45, the Coast Guard devoted an entire chapter to environmental justice impacts and complied not only with its own methodology, but with CEQ guidance as well. *See* AR 5158–66; *Environmental Justice Guidance* 10–16.[32] It delineated a clear study area, defined the low-income and minority populations within this study area, and determined that the Project would not result in these populations bearing any disproportionate environmental burden. *See* AR 5158–66. In reaching this determination, the Coast Guard properly relied on its consideration of the Project's temporary

---

[32] CEQ's *Environmental Justice Guidance* identifies six principles agencies should follow in conducting an analysis of environmental justice impacts, two of which are especially relevant here. *Environmental Justice Guidance* 9. First, an agency should "consider the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on" these populations. *Id.* Second, an agency should "consider relevant public health data and industry data concerning the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population and historical patterns of exposure to environmental hazards, to the extent such information is reasonably available." *Id.* Importantly, however, CEQ's guidance does not prescribe "a standard formula for how environmental justice issues should be identified or addressed." *Id.* at 8.

construction, induced growth, and cumulative impacts elsewhere in the final EA—analyses that the Court concludes satisfy NEPA—as well as on other chapters of the final EA not otherwise challenged by Plaintiffs. *See Environmental Justice Guidance* 10 ("Neither the Executive Order nor this guidance prescribes any specific format for examining environmental justice, such as designating a specific chapter or section in an EIS or EA on environmental justice issues."). In doing so, the Coast Guard complied with the requirements of the Executive Order, which "does not change the prevailing legal thresholds and statutory interpretations under NEPA and existing case law." *Id.*

It is true that the Coast Guard did not evaluate potential mitigation measures, but nor did it need to in light of its determination that low-income and minority populations would not suffer any significant adverse impacts, disproportionate or otherwise. Environmental justice impacts—like all other potential impacts evaluated under NEPA—must be significant before further analysis or the preparation of an EIS is required. The Coast Guard's determination that the Project would not result in any significant adverse impacts on *any* community, including any disproportionate impact on environmental justice communities, obviated the need for further study of environmental justice impacts here.[33]

In short, the Coast Guard did all that the Executive Order—and that NEPA—requires. It took an adequately "hard look" at the Project's environmental justice impacts, and its conclusion that the Project would not have any significant adverse impacts, or disproportionately burden sensitive communities, is rational and well-supported in the record.

---

[33] The Coast Guard's determination that air quality in the communities immediately adjacent to the Project would comply with NAAQS even during the construction phase further supports its conclusion that such local adverse impacts would not be significant.

## CONCLUSION

The record in this case reflects that the Coast Guard took the "hard look" at Project-related impacts that NEPA requires, and that its decision to issue a finding of no significant impact and an amended construction permit on the basis of this "hard look" was neither arbitrary nor capricious. Accordingly, remand to the Coast Guard for the preparation of an environmental impact statement is both unnecessary and unwarranted.

For the reasons stated, Plaintiffs' motion for summary judgment is denied, and Defendants' motions are granted. The Clerk of Court is respectfully requested to close all of the motions currently pending in this action, and to close the case.

SO ORDERED.

Dated:     November 24, 2015
           New York, New York

Ronnie Abrams
United States District Judge

56